A petition for a rehearing was denied March 9, 1951.

A. FARNELL BLAIR CO., INC. (a Corporation), Respondent, v. HOLLYWOOD STATE BANK (a Corporation), Appellant.

McClean & Petty, and Walter G. Danielson for Appellant.

Crider, Runkle & Tilson for Respondent.

SHINN, P. J.—This action arose out of a controversy between plaintiff, a government contractor, and defendant bank over part of the earnings of a subcontractor, who was also a

supplier of material to the contractor. The bank claimed as assignee of the earnings in question. The contractor claimed to have expended all the money in the payment of claims against the subcontractor having priority over the rights of the bank. There was also involved a special agreement of the contractor to withhold from payments earned by subcontractor sufficient to pay the loans of the bank. The dispute arose in the following manner.

In January, 1946, one Blair received a contract from the United States Government for construction work at Camp Pendleton, Oceanside, which he assigned to plaintiff corporation. Plaintiff assigned to defendant bank all sums to be earned under the contract and from then on the bank financed plaintiff's operations. On or about February 9, 1946, plaintiff gave one Cook a purchase order for mixed concrete at $8.00 per cubic yard to be used by plaintiff in performance of the general contract. On February 28, 1946, by subcontract, plaintiff let to Cook certain asphaltic concrete work on the job for a price of $79,314. By additions and deletions this price was increased to $96,613.74. Cook, having been introduced at the bank by plaintiff, had borrowed money at different times upon certain security all of which was repaid. He carried on his work under both agreements and by November 25, 1946, had earned considerable sums of money. He then applied to the bank for further financing and arranged to assign to the bank sums due and to become due under the purchase order and subcontract. The bank's credit manager arranged with plaintiff for its consent to the assignment by Cook on terms which were stated in plaintiff's letter to the bank of November 25, 1946, reading as follows:

"Mr. Richard Neiderhouser,
Hollywood State Bank,
6801 Santa Monica Boulevard,
Los Angeles, California.

Subject: Assignment of Subcontract of Cal Cook
to Hollywood State Bank, A. Farnell
Blair Navy Contract NOy-13047

"Dear Sir:

"This will confirm my telephone conversation with you of today regarding the caption subject.

"Please be advised that we are agreeable to Mr. Cook's assignment of his sub-contract with us to the Hollywood State Bank.

"This is to further advise you that we will protect this assignment by withholding the final payment or necessary payments to assure you the remaining balance due you from Mr. Cook as of that date.

"Upon my return to the city next Saturday, I will be able to advise you the amount due Mr. Cook on his next partial payment.

Very truly yours,

A. Farnell Blair Co., Inc.
C. B. Antill
Vice President and General Manager.''

A few days later Cook delivered to the bank the purchase order and the subcontract, and assigned to the bank all of his right, title and interest in and to monies then due or to become due thereunder. Between that date and March 30, 1947, the bank made nine separate loans to Cook.

Under the purchase order Cook was entitled to receive the full amount of his invoices for concrete delivered. Under the subcontract, work was to be paid for as it was placed in position upon invoices furnished by Cook, 10 per cent being withheld by plaintiff until completion and approval of the work and the production of evidence that Cook's material and labor bills had been paid. Cook proceeded with performance of both agreements as hereinafter stated.

The subcontract provided as follows: "Third. The Sub-Contractor will prosecute the work with due diligence, without delay, and will not in any manner, by delay or otherwise, interfere with the work of the Contractor, or other Sub-Contractors, and should the Contractor conclude that the Sub-Contractor is delaying the work, he shall so notify the Sub-Contractor, who shall immediately thereafter, furnish whatever materials are required by the Contractor, and in case the Sub-Contractor fails to comply with these demands, the Contractor shall have the right to furnish all materials and employ any additional men and charge the expense thereof against the Sub-Contractor, and deduct same from any monies due or to become due by this contract, and should the amount or balance due on said contract be insufficient, to collect said deficiency by legal process.''

Plaintiff gave Performance and Payment Bonds under the base contract pursuant to the Miller Act (title 40 U.S.C.A. § 270(a) et seq.).

The rights of the parties *under the subcontract* may be stated broadly as follows: The bank had a right to receive Cook's gross earnings under the subcontract less any deductions which might result from the exercise by plaintiff of one or more of the following rights: (a) Upon notice to Cook, in case the work was being delayed, to furnish any material and labor pursuant to paragraph 3 of the agreement and to charge Cook with the cost; (b) upon cancellation of the subcontract for Cook's default or upon abandonment by Cook to finish the job and deduct the cost from Cook's earnings; (c) to pay and discharge Cook's obligations for labor and material furnished by him for which plaintiff and its surety were liable under the government contract and bonds.

The rights of the parties under the concrete purchase agreement were the following: Plaintiff had a right to deduct from Cook's gross earnings sums paid to Cook's creditors for which plaintiff and its surety were liable under the government contract and bonds; the bank was entitled to the remainder.

The controversy arose as follows: Cook had been performing under the two agreements and by November 25, 1946, although he had earned considerable sums of money, was indebted to plaintiff in the principal sum of $7,963.78, balance of a demand note he had given plaintiff in March, 1946, and in certain other amounts. After November 25th he proceeded with the performance of both agreements, and upon invoices furnished by him plaintiff paid by checks, payable to Cook and the bank jointly, and delivered to the bank, the amounts of Cook's earnings after making certain deductions, to which we shall refer later. Upon the basis of Cook's invoices the bank continued to loan him money once or twice a month. The total amount paid to the bank under the subcontract was $45,909.31 and under the purchase order $50,719.96. Plaintiff made no payment to the bank under the subcontract after February 27, 1947, and paid nothing on the purchase order after March 17, 1947. On April 1st Cook owed the bank on notes $41,336.92, which included a loan of $10,000 made to him on that day. On May 29, 1947, the bank deducted $25,000 from plaintiff's deposit account, and on or about October 2, 1947, deducted further sums amounting to $17,445.82 and applied the same to extinguish Cook's indebtedness of $42,445.84. Plaintiff sued for recovery of this sum and was given judgment for about $32,000. For the reason that plaintiff had given the bank false credit information as

to Cook's standing under the agreements at the time the bank made its last loan plaintiff was held estopped to recover $10,000 of the sums deducted from its deposit account. The bank appeals.

Plaintiff took over the subcontract work from Cook August 20, 1947. Although the court did not make a finding that Cook had abandoned the work the evidence indicated that he had done so. On June 25, 1947, a receiver took charge and possession of his business, but his possession was of short duration. In July Cook filed a petition in bankruptcy. Testimony was given by Mr. Kite, plaintiff's vice-president and local manager, as to the conditions under which plaintiff took over the work. He was asked whether plaintiff at any time undertook performance of any portion of the contract and testified: "May I ask a clarifying question? Q. Yes. A. Does the fact that we furnished men at various times throughout the job to do various and sundry odd jobs for Cook constitute our performing part of the contract? Q. No, I have in mind the time when your company stepped in and took over the job and began the performance of any unfinished work? A. Yes, we did. Q. On what date was that? MR. RUNKLE: I believe that is what we previously agreed on. A. August 20th. MR. RUNKLE: By the letter of August 20, 1947, which, however, followed previous orders that were in the nature of warning and trying to get Cook to perform. MR. DANIELSON: It will serve our purpose if we stipulate as of August 20, 1947, the plaintiff stepped in for the purpose of performing any balance of work required under CFO-112. Is that stipulated? MR. RUNKLE: Yes. . . . Q. BY MR. DANIELSON: And up to that time, then, Cook was performing his contract? A. He was not. Q. Well, was there anyone else performing it on his behalf? A. There was no one performing it." The subcontract work was at a standstill. Plaintiff let a subcontract to one McClanahan for completion of this work and paid him on November 7, 1949, $19,509.13 and also paid for patching Cook's work on the same date, $1,287.98. There appears to have been little or no activity on the subcontract work between June 25th and the date of the contract with McClanahan.

The principal evidence as to the status of the two accounts was that furnished by plaintiff's books. A summary that was received in evidence well illustrates the problem that confronted the trial court, but does not, by any means, furnish a solution. According to the summary Cook was credited

with $96,613.74, the amount of the subcontract, and $144,-691.44 for concrete and other materials delivered under the purchase order, making a total of $241,305.18 total earnings. He was paid $45,909.31 on the subcontract and $103,839.72 under the purchase order, or a total of $149,749.03. He was charged with numerous items which amounted to $86,803.32. Upon these figures a balance was shown in Cook's favor of $4,752.83. Evidence as to other items, amounting to $5,549.57, which were not on the summary, overcame this balance and left Cook indebted in the sum of $796.74 and brought the total charges against the two contracts to $92,352.89.

Cook earned under the *subcontract* $96,613.74; the cost of completion and patching was $20,797.11 leaving net earnings of $75,816.63. Since the bank was paid on account only $45,909.31 the balance of Cook's earnings not paid to the bank was $29,907.32. Although plaintiff paid nothing under the purchase order after March 17, 1947, Cook was credited with deliveries through June and charges were entered against him for April, May and June. Between November 29, 1946 and April 1, 1947, Cook earned *under the purchase order* $71,097.82. The bank was paid $50,719.96, leaving a balance of $20,377.86 of earnings that were not paid to the bank. The total earnings not paid to the bank were $50,285.18 (this is exclusive of concrete deliveries after April 1st which amounted to $13,679.55). The gross earnings of Cook under each contract were stated separately in the summary but the charges against him were not segregated to show which were made against the subcontract earnings and where were charged against the earnings under the purchase agreement.

The dispute concerns the propriety of plaintiff's countercharges. Except as to the payment to McClanahan of $19,-509.13 for completion of the work, and the item of $1,287.98 for repairing some of Cook's work, the bank's objections run to practically all of the countercharges. The court made the following finding: ''Said Cook failed fully to pay the bills and claims incurred by him for labor and material furnished to him for use in, and which were used by him in the performance of said *purchase order and said subcontract,* and plaintiff was forced to and did pay said bills and claims by virtue of plaintiff's obligations under said general contract and said payment bond and said performance bond. Plaintiff expended sums *for the completion of said subcontract* of said Cook *and for the payment of said bills and claims against said Cook for labor and material* in an aggregate

amount in excess of the balance of the contract price other-wise due from plaintiff to Cook from and after March 17, 1949 [sic].''

Plaintiff contends that this finding is a complete answer to the contention that greater sums were earned by and payable to Cook than were paid to the bank. It maintains that it had the right to apply all Cook's earnings under the subcontract *and* the purchase agreement to the payment of Cook's indebtedness to it existing on November 25th, and to all his obligations for labor and material of whatsoever nature incurred in his operations under both contracts. It also says as to the subcontract: ''The bank obviously did not become entitled to the gross amount of the subcontract price. Cook had to perform his subcontract before any money was earned by him. Obviously Cook could not retain anything from the subcontract price except the profit that he made in performing the contract. This was the limit of Cook's rights. It was, therefore, the limit of the rights obtained by the bank by virtue of its assignment.'' The bank contends that it was necessary for the court to compute separately Cook's earnings under the subcontract and the purchase agreement, and to ascertain the sums that were deductible under each agreement; it was plaintiff's duty under the November 25th letter agreement to pay over to the bank Cook's gross earnings under the subcontract minus only sums properly chargeable against his earnings under that agreement; countercharges or offsets against Cook's earnings under one agreement were not deductible from his earnings under the other.

The court did not make any finding as to the gross amount earned by Cook under either agreement, nor as to the amount that was deductible from his gross earnings under either agreement. We shall consider first the bank's contention that the quoted finding does not determine the principal issue or furnish support for the judgment. As between plaintiff and the bank Cook's assignments to the bank represented separate transactions. Although as between plaintiff and Cook the latter's obligations under one contract might have been charged against his earnings under the other, as was done in the accounting rendered by plaintiff, this could not be done to the detriment of third parties who had claims upon his earnings under either contract or under both. And it was especially necessary for the court to find specifically as to the status of the account under the subcontract. Plain-

tiff's letter of November 25th was written in response to the bank's inquiry as to whether plaintiff would protect the bank's loans if it took an assignment of the subcontract. The letter expresses an unequivocal and unconditional promise of plaintiff to withhold and make available to the bank from Cook's earnings *under the subcontract* a sufficient sum to pay in full Cook's indebtedness to the bank at the time the contract came to an end. There was no agreement that plaintiff might deduct from those earnings any charges for which Cook might be liable *under the purchase agreement*. It was not shown that the bank had knowledge of or consented to any such deductions. Although plaintiff did on February 27, 1947, deduct from Cook's earnings under the subcontract $5,384.42, made up of items which appear to have pertained to the purchase agreement, there was nothing in the memorandum submitted by plaintiff to the bank at that time to indicate, nor did the bank have knowledge, that these charges did not pertain to the subcontract.

Upon the trial plaintiff did not undertake to prove which of its countercharges or offsets arose out of the subcontract as distinguished from the purchase agreement. It merely asserts now that they all related to the work which it was required to perform for the government and says further, with relation to all of the items: "There is no evidence whatsoever that any one of these offsets did not arise out of or was not connected directly with Cook's subcontract." Plaintiff had superior knowledge of the facts, and the burden was upon it to prove which charges were against the subcontract earnings, and that they were proper charges. It not only failed to do so but has not attempted to point out any evidence which would prove that its several charges were against one agreement or the other. It did, however, deduct from Cook's earnings under the subcontract certain amounts for application upon a note for $15,000 which Cook had given in March, 1946, and, as we have said, among its charges was the amount paid to McClanahan for completing the job and the sum of $1,287.98 for patching Cook's work. It is not questioned that the last two sums were properly deducted from the earnings under the subcontract. Upon the other hand the bank lists items amounting to $33,231.52 charged against Cook's total earnings which it asserts related exclusively to the purchase order. We find no denial of this statement in plaintiff's brief. There was evidence that of this total $17,364.48 was paid to Riverside Cement Company for cement, which had nothing to do with

the subcontract. Plaintiff gave Cook three checks amounting to $2,350 which, so far as the record shows, were loans which plaintiff collected by deducting the amount from Cook's earnings. It would serve no purpose to enumerate the many other items. ■ Findings were required as to the disbursement of Cook's money, stating as to each item whether it was taken from earnings under the subcontract or the purchase order. These are questions of fact as to which the evidence is incomplete and inconclusive. We cannot undertake to decide them.

■ The finding that "plaintiff was forced to and did pay said bills and claims by virtue of plaintiff's obligations under said general contract and said payment bond and said performance bond" is not supported by the evidence. Under the purchase order Cook did no work of installation. He was only a materialman. Plaintiff's obligations to him under the purchase order differed materially from those under the subcontract. Plaintiff argues that it was obligated under the base contract and that its surety was bound to pay all debts incurred by Cook in the work and for that reason it had a right to apply all earnings under both contracts to the payment of Cook's labor and material bills, and any other bills, as long as the money was used for Cook's benefit under his agreements. The trial court evidently adopted this theory. The principal authorities relied upon by plaintiff are the following: *First Natl. Bank* v. *City Trust, Safe Deposit & Surety Co.,* 114 F. 529 [52 C.C.A. 313]; *Title Guaranty & Surety Co.* v. *Dutcher,* 203 F. 167; *American Bonding Co.* v. *Central Trust Co.,* 240 F. 400 [153 C.C.A. 326]; *New Amsterdam Casualty Co.* v. *City of Astoria,* 256 F. 560; *Pratt Lumber Co.* v. *T. H. Gill Co.,* 278 F. 783; *Exchange State Bank* v. *Federal Surety Co.,* 28 F.2d 485; *Farmers' Bank* v. *Hayes,* 58 F.2d 34; *Moran* v. *Guardian Casualty Co.,* 76 F.2d 438 [64 App.D.C. 188]; *United States Fidelity & Guaranty Co.* v. *Sweeney,* 80 F.2d 235; *Standard Acc. Ins. Co.* v. *Federal Nat. Bank,* 112 F.2d 692. These were all cases involving claims of sureties to preferred rights where they had paid or would be required to pay labor and material claims under contracts for public work, the funds involved being those on hand after completion of the work by the contractor or by the surety following abandonment of the work by the contractor. They all fall within the following rules: Assignees of a contractor of funds to be earned in public work take with notice of the

terms of the contract and of the undertaking of the contractor's surety. (*New Amsterdam Casualty Co.* v. *City of Astoria, supra,* 256 F. 560.) "Where a surety of a construction contractor, upon the contractor's default, completes the contract, and the contractee has funds in his hands earned by the contractor, the surety is entitled to be subrogated to the rights which the contractee, upon the contractor's default, could assert against such funds, to the extent necessary to reimburse the surety for the outlay made to complete the contract. This right to the funds embraces not only retained percentages, but other funds earned by the contractor remaining in the hands of the contractee." (*Standard Acc. Ins. Co.* v. *Federal Nat. Bank,* 112 F.2d 694.) The bank does not question that both plaintiff and its surety had a right to finish Cook's uncompleted subcontract work and to charge the cost against the amounts that Cook had earned and the balance of the contract price which remained unearned. This right was in addition to the provision of paragraph 3 of the agreement under which plaintiff could, in certain conditions, supply necessary labor and materials to accelerate or finish the work at Cook's expense. Plaintiff was obligated by its contract to pay all labor and material bills which it incurred in the prosecution of the work. Its surety was likewise obligated under the Miller Act (40 U.S.C.A. § 270a et seq.). Although the bank does not deny that plaintiff had a right under paragraph 3 of the subcontract to take charge of the work and furnish labor and material at Cook's expense plaintiff did not operate under this provision and does not base its claims thereon. After August 20th, when Cook was displaced, the job remained idle until McClanahan took it over.

Plaintiff's liability under the contract and bond ran to all obligations of Cook for material and labor which he furnished under the *subcontract*. These would have to be satisfied eventually by plaintiff and its surety if Cook failed to meet them. Plaintiff and its surety were also obligated under the government contract and bond to pay Cook for all materials which he furnished as a materialman under the purchase order. Payment to Cook for such materials would have satisfied any obligation of plaintiff and its surety under the contract and bond, so far as the materials were concerned, and payment to the bank as Cook's assignee would have been equivalent to payment to Cook. But the contract with the government and the bond did not obligate plaintiff or its surety to pay materialmen for materials furnished Cook to

be used in mixing concrete which Cook was selling to plaintiff at a fixed price per cubic yard. Section 270b (a)[1] of the Miller Act and the statutory bond do not impose such an obligation. It was said in *MacEvoy* v. *United States*, 322 U.S. 102 [64 S.Ct. 890, 88 L.Ed. 1163]: "Specifically the issue is whether under the Miller Act a person supplying materials to a materialman of a government contractor and to whom an unpaid balance is due from the materialman can recover on the payment bond executed by the contractor. We hold that he cannot." MacEvoy held a construction contract with the government, purchased materials for use in the prosecution of the work from James H. Miller & Company who, in turn, purchased the materials from Calvin Tomkins Company but failed to pay the latter. Tomkins, after notice given to MacEvoy, brought suit against him and his surety. After examination of the act and its history it was held that the word "subcontractor" was used in the proviso of section 2a in its technical sense so as to exclude materialmen and laborers. Liability on the bond did not run in favor of Tomkins as a supplier of materials to a materialman. Plaintiff, here, in purchasing materials for Cook and in paying his obligations with respect to the purchase of materials for use in mixing concrete acted outside the scope of its obligations under the government contract.

On December 3, 1946, Cook owed Riverside Cement Company $8,917.12, presumably for cement purchased for use in carrying out his agreement to furnish plaintiff with concrete. On that day plaintiff guaranteed payment of Cook's account then due and also payment for future deliveries to

---

[1]Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: *Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed.

him for material to be supplied to plaintiff. The cement company continued to sell to Cook and there was owing on February 20, 1947, $16,970.88. The total balance was not paid by plaintiff until the following November. Although this cement was used by Cook in supplying plaintiff with concrete plaintiff paid him nothing for it, but after the two contracts were completed paid the cement bill directly to Riverside Cement Company, using money then due Cook for that purpose. Plaintiff made other purchases of cement in large amounts for Cook's use and charged the same to his account. Its charges also included a multitude of items for labor and materials furnished, gasoline purchased, truck drivers' wages and demurrage paid on freight shipments.

We think it would be helpful to mention several other transactions in which plaintiff laid out money. It will serve to point out that a great deal of the money appears to have been used to pay for material which went into the concrete Cook was selling to plaintiff. It will also furnish a basis for our discussion of the bank's further contention that plaintiff's disbursements were, in large part, not the payment of obligations incurred by Cook for which plaintiff was liable, but merely loans to Cook as to which it became a general creditor. Plaintiff deducted from Cook's earnings $8,574.51 for rental of trucks equipped with concrete mixing attachments. This equipment was rented to Cook by a corporation wholly owned by Mr. Blair, who is the sole owner of plaintiff corporation. Plaintiff also paid substantial bills for truck drivers' wages and for demurrage on freight shipments to Cook. The nature of the materials shipped is not explained. There were also substantial purchases of gasoline, but whether for use under the subcontract or in the furnishing of concrete is not disclosed by the evidence. The question arose whether such items of indebtedness were within the liability of the contractor and his surety where the things were furnished to one who was merely supplying material to the contractor. Although there was evidence that the cement purchased from Riverside Cement Company was used in the mixing of concrete, and it appears probable that many of the other items were furnished to Cook as a materialman, these were factual questions for the trial court. It does appear to us, however, that if a contractor on government work is liable for gasoline furnished to a materialman for use in trucks which he has rented to transport and mix materials into concrete which he is selling to the contractor there would be no end to the chain.

When it is determined which of the questioned transactions related to the subcontract and which to the purchase of concrete the decision and the reasoning of the MacEvoy case will furnish answers to the questions we have just mentioned.

The foregoing applies to all transactions which may be determined not to have been loans as to which plaintiff would be a general creditor. A further contention of the bank is that in most instances of assistance given Cook plaintiff was merely advancing him money, material or credit, without any obligation to do so, and became as to such loans a general creditor. This would appear to be true as to all cash advances and some of the other transactions. The bank, of course, would have preferred rights as against subsequent loans made by plaintiff, whether of money or material, which were to be repaid from Cook's earnings. ▮ Plaintiff is correct in saying that an assignee stands in the shoes of his assignor and that the bank acquired no greater rights than Cook had. But those rights were the ones which arose out of the agreements and which existed at the time of the assignments. Cook, under his agreements, was entitled to receive his gross earnings. He did not agree in his contracts with plaintiff that the latter could appropriate those earnings in furtherance of performance of his obligations as it might see fit. Cook's rights passed to the bank. Thereafter Cook and plaintiff could not alter their contractual obligations to the detriment of the bank. If the rights of assignees could be defeated by such subsequent voluntary arrangements the financing of construction contracts would be a hazardous business. And it must be remembered that plaintiff had a definite obligation under its letter agreement with respect to the handling of money earned by Cook. If it chose to voluntarily use Cook's money in such a way that Cook and the bank would get none of it the consequences are its own responsibility.

Each party accuses the other of negligence and asserts its own freedom from negligence, contending that the loss should fall upon the other. The rule that "where one of two innocent persons must suffer by the act of a third, he by whose negligence it happened, must be the sufferer" (Civ. Code, § 3543) would seem to work both for and against each of them. The bank kept on loaning money to Cook, relying upon plaintiff to look after its interests. Plaintiff, having obligated itself to see that Cook's loans were repaid, was

apparently indifferent as to the amounts and status of the loans, and as to whether Cook repaid them. There was no finding of negligence against either party, nor was negligence established as a matter of law. ■ Only the trial court can determine the factual questions involved in the claims of negligence.

It was alleged in the bank's answer as a separate defense that: "During all of the times between said November 29, 1946, and April 3, 1947, plaintiff represented to defendant that said Cook was duly and regularly performing and discharging the said sub-contracts and that plaintiff was protecting the assignment of Cook of said funds due or to become due under said sub-contracts and that plaintiff was withholding sufficient funds to insure payment to defendant of all loans and advances made to Cook. Defendant further alleges that on or about April 1, 1947, at a time when Cook was indebted to defendant in the sum of $31,336.92, plus certain accrued interest, said Cook made application of defendant for a further loan of $10,000.00, whereupon defendant inquired of plaintiff as to the status of said sub-contracts and plaintiff advised defendant, in writing, that said Cook could expect to receive, within the next 45 days, the sum of $44,-063.27, and that in addition thereto said Cook would receive upon the completion of the sub-contracts the sum of $9,745.69. Thereupon and in reliance upon said representations of plaintiff, defendant, on April 3, 1947, loaned to said Cook said additional sum of $10,000.00. . . . By reason of the agreement as afore alleged that plaintiff would recognize and protect the assignment by Cook, to defendant of funds due or to become due under said subcontracts and would insure and guaranty payment to defendant of all sums due from Cook upon the completion of said subcontracts, and the representations made by plaintiff to defendant from time to time that said Cook was properly discharging and performing said subcontracts and the further representations at the time defendant made its last loan to Cook on April 3, 1947, which brought his indebtedness to the defendant to the sum of $41,336.92, plus interest, that said Cook within forty-five days from April 1, 1947, would receive the sum of $44,063.27 and the additional sum of $9,745.69 upon the completion of the subcontracts, and upon all of which agreements and representations defendant relied in making said loans to Cook and without which agreements and representations, defendant would not have made said loans, plaintiff is estopped from asserting that

its indebtedness to Cook is in any sum less than the amount required to pay in full said obligations of Cook to defendant or that defendant was without right to off-set said indebtedness against said indebtedness to the plaintiff.'' ▋ The court found that on or about April 1, 1947, plaintiff wilfully gave the bank false information as alleged in the bank's answer, and that by reason thereof the bank made an additional loan to Cook of $10,000. Plaintiff's recovery was reduced to the extent of $10,000 under the doctrine of estoppel. The court made no other finding as to this defense of estoppel. Neither did it conclude as a matter of law that plaintiff was or was not estopped as claimed in the special defense. Plaintiff, while insisting that the findings are sufficient to dispose of all the issues, claims that if a specific finding had been made upon the allegations of the affirmative defense it would necessarily have been adverse to defendant. We cannot agree with either contention. The findings are silent as to the facts pleaded. The evidence and inferences that could reasonably have been drawn therefrom would have supported an affirmative finding on the estoppel issue. On November 25, 1946, Cook was indebted to plaintiff on past transactions in the sum of $14,753.66, including a balance on the note of $7,963.78. The note indebtedness was deducted from plaintiff's checks to the bank in January and February, 1947, and plaintiff either made deductions of the remainder of the past indebtedness from its remittances or offset the same against Cook's earnings. The bank had no knowledge of this past indebtedness. Neither was it advised by plaintiff of Cook's indebtedness for cement or plaintiff's guaranty of the account on December 3, 1946. There was evidence to be evaluated by the trial court that plaintiff represented to the bank that Cook's work was progressing satisfactorily, even as late as April 1, 1947, and also evidence from which it could have been inferred that the bank relied upon the representations and silence of plaintiff and was thereby influenced to make further loans to Cook. The entire evidence along this line presented questions of fact as to what the duties of plaintiff were with reference to supplying information to the bank, whether plaintiff was guilty of breach of duty, what its motives were, to what extent the bank was justified in relying and acting upon plaintiff's representations and omissions, and whether it did rely and act upon the same to its detriment in its dealings with Cook. ▋ The principle by which the conduct of the parties must

be judged is stated in section 1962(3) of the Code of Civil Procedure: "Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot in any litigation arising out of such declaration, act, or omission, be permitted to falsify it." An estoppel necessarily results when this factual basis has been established. Unless the several elements of estoppel are established by unconflicting evidence or by findings of a trial court the rule cannot be applied on appeal. Defendant's contention that we should hold as a matter of law that plaintiff is estopped is just as untenable as plaintiff's contention that we should hold to the contrary. The issue must be retried. ▮▮ The failure of the court to make findings upon this affirmative defense would, in itself, require a reversal of the judgment.

From December, 1946, through March, 1947, plaintiff deducted from checks sent to the bank a total of $20,792.21, included in which were charges against Cook for debts existing November 25th and also various claims arising later. The memoranda that went with the checks contained notations such as "Less B/C #59—290.05; less 12% to apply on note 2739.36; Natl Equip Inv. 940" etc. Most of the notations were like the first of these. No explanatory information was given the bank. As to these payments the court found: "Through said letters of transmittal defendant received notice and knowledge of said deductions and of the obligations of said Cook to plaintiff on account of which said deductions were made, and despite such notice and knowledge, defendant made no objection to any of said deductions and received and accepted and cashed said checks evidencing said progress payments from plaintiff to said Cook, and after receiving such notice and knowledge defendant continued to make additional loans to said Cook." The court stated the following conclusion of law: "Defendant consented to the deductions made by plaintiff from payments of installments of contract price which were made prior to April 1, 1947 and waived the right to object to such deductions." The bank contends that this finding is unsupported by the evidence and that the conclusion of law is erroneous. It argues that the failure to object was clearly shown to have been an oversight and that there was no evidence of an intention to waive any rights under the assignments. It is to be noted that the finding is only that the bank waived its right to receive certain sums which were withheld by plaintiff and that there was no finding that there was a waiver

of the bank's right to require plaintiff to live up to its promise expressed in the letter of November 25th. This entire issue must be retried. More is involved than is covered by the finding. It would serve no purpose to discuss the claim of insufficiency of the evidence to support the finding that was made.

The judgment must be reversed for insufficiency of the evidence to support the basic finding that all the sums in question were expended by plaintiff in payment of obligations for which it was liable under the government contract and the surety bond. The failure to find on the defense of estoppel is an additional ground for reversal.

The judgment is reversed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied March 14, 1951, and respondent's petition for a hearing by the Supreme Court was denied April 19, 1951.

[Civ. No. 17721. Second Dist., Div. Three. Feb. 20, 1951.]