138 Cal.App.2d 123 (1955)
292 P.2d 39
CLEON E. BENSON, Respondent,
v.
MARK E. ANDREWS et al., Defendants; ANGELA E. HENRY et al., Appellants.
Docket No. 21125.
Court of Appeals of California, Second District, Division Two.
December 21, 1955.
*125 Ball, Hunt & Hart, Bruce Mason and Clark Heggeness for Appellants.
George R. Maury, Maury, Larsen & Hunt and Ray L. Mayfield for Respondent.
FOX, J.
This is an appeal from a judgment awarding plaintiff the sum of $9,000 against defendants Angela Henry and George Henry and decreeing foreclosure of a second deed of trust securing that amount in default of payment thereof.
The principal question involved is whether plaintiff, as assignee of a promissory note secured by a deed of trust, may enforce said instruments despite the existence of a defense valid against his assignor.
Defendants Angela Henry, a widow, and her unmarried son, George, owned an unimproved lot as joint tenants on *126 which they desired to erect an apartment building. They consulted Mark Andrews, a licensed general contractor, who offered to build a five-unit apartment house for $30,700. Mrs. Henry explained that she could provide only $3,700 as a down payment. Andrews informed her that the Travelers Insurance Company would make a construction loan of about $17,000, secured by a first trust deed. Andrews testified that he told Mrs. Henry that the balance "I would take back in the form of a second trust deed to be paid after completion of the building, as soon as she started getting rents." Andrews also advised her that Travelers would not give her a large enough loan because she was a widow and suggested that the property be conveyed to him so that the loan would run to him as owner-builder. He promised that when the building was completed he would reconvey the property.
On May 12, 1950, the Henrys and Andrews entered into a written contract embodying their agreement for the construction of the apartment building. This document recited, in paragraph 3, that in consideration of its terms being strictly performed, "including the supplying of all labor, materials and services required by this contract and the construction and completion of the structure," the Henrys agreed to pay the sum of $30,700 in the following installments:

 "$ 2,000. Payable on signing of contract
 $ 1,700.00 Due August 1, 1950
 $17,000.00 From Lending Institution
 $10,000.00 2nd T.D.[1]
 Payments on 2nd Trust Deed to be $150.00 or more
 per month beginning at completion of
 construction." (Emphasis added.)

On June 17, 1950, two escrows were opened to consummate the agreements of the parties. The first escrow provided for the conveyance of the Henry property to Andrews for purposes of securing the loan from Travelers. This escrow was closed in June, 1950, after the Henrys delivered a deed of the property to Andrews and had it recorded.
The second escrow contained the instructions concerning *127 the building contract.[2] No specific time was fixed therein for the completion of the building. The instructions provided that the Henrys would execute a note for $9,000 to Andrews secured by a second deed of trust; and that Andrews would convey the property after competion of the structure clear of all encumbrances except current taxes, the $18,000 first trust deed to Travelers, and the $9,000 second trust deed to Andrews. Concurrently with the execution of these instructions, the Henrys executed and deposited in escrow a "Note Secured by Deed of Trust" payable to Andrews in the sum of $9,000. The deed of trust securing the note was simultaneously executed and placed in escrow. The note provided that installments were to be made monthly at the rate of $150 per month, or more, commencing on November 1, 1950. (It was expected by the parties that the building would be completed by approximately the first of November.) The Henrys paid Andrews the $3,700 in cash called for by the contract.
Andrews began to build shortly after the escrows were opened, but he failed to complete the work by November, 1950. At about the beginning of 1951, Andrews found himself in *128 a precarious financial condition. He could not meet his bills and his creditors were pressing for payment. Progress on the Henrys' project came to a virtual halt. Mrs. Henry asked Andrews to deed the property back to her early in 1951, but Andrews put her off. During the succeeding months, liens and attachments began to be filed against the property, some of them unconnected with Andrews' construction of the apartment house. The United States filed a tax lien against Andrews for about $3,600. A collection company filed an attachment on the property for a debt extraneous to the building. The Travelers Insurance Company, which had advanced $9,900 of its $18,000 commitment, refused to furnish the balance until the liens and attachments were cleared. Not only was Andrews unable to clean these liens, but other suppliers and materialmen recorded mechanics' liens against the property.
Plaintiff, who builds and installs cabinets for residences, had done business with Andrews prior to and during 1950. He had furnished cabinets for homes and apartment houses constructed by Andrews and kept a record of their transactions in an open book account. On January 1, 1951, the balance owed by Andrews to plaintiff was $8,299.50. Because Andrews was becoming increasingly delinquent in settling his accounts and one of his checks had been dishonored by the bank, plaintiff sent his agent, Stenersen, to discuss the matter of payment with him. Stenersen testified Andrews stated he owned the lot and had some additional money in it; that it was being sold to Mrs. Henry in exchange for the second deed of trust; "and because of the fact that its monetary value was about the same as the amount that he owed, he thought it would be a fair exchange if Mr. Benson [plaintiff] held that as security or used it to pay the amount due." Andrews told Stenersen the instrument was in escrow and suggested "we could go down and assign it to Mr. Benson." That same day, January 19, 1951, Stenersen and Andrews went to the office of the escrow holder, where Stenersen examined the deed of trust and the note, on which none of the payments (to commence November 1, 1950) had been made. Stenersen testified that Andrews told him that Mrs. Henry "wasn't going to pay them until she rented the apartments." Andrews testified he explained that none of the installments had been paid, and that nothing would "be paid until after the building was completed." Thereupon, Andrews executed an assignment of the note and trust deed *129 to plaintiff[3] and signed a supplemental instruction to the escrow holder authorizing the recordation of the assignment concurrently with the other documents in the escrow. The bad check issued by Andrews to plaintiff was later returned to him. Plaintiff testified Andrews was credited in full on his books for the amount owing at the time of the assignment.[4]
The Henrys were not notified of the assignment by either plaintiff or Andrews and did not obtain personal knowledge of the assignment until late in July, 1951. Earlier that month, Mrs. Henry first learned of the liens and attachments which had been placed on the property as the result of Andrews' personal debts and his failure to pay materialmen who had supplied him on the Henry job. Mrs. Henry consulted her attorney on or about July 15, and then called Andrews to demand that he turn the property back to her. Andrews admitted that he was in financial straits and that further encumbrances might be expected. He agreed that the only way to avoid the filing of other extraneous liens and encumbrances was to restore the property to the Henrys, although the building he agreed to construct was not yet completed. Mrs. Henry accompanied Andrews to the escrow office to close their pending escrow. Reports from the title company disclosed the existence of various claims of lien and attachments on the property, aggregating about $12,000. Although the previous instructions required the property to be delivered to her free of encumbrances except for taxes and a first and second deed of trust, Mrs. Henry modified the instructions by authorizing the title policy to show these claimed liens. At the same time Mrs. Henry and Andrews executed a document stating that, although Mrs. Henry approved the showing of liens in the title policy, Andrews was in no way relieved of his responsibility to clear the liens. This being accomplished, the escrow was closed on July 19, 1951
*130 The second deed of trust to Andrews, which had been deposited a year earlier, was duly recorded by the escrow holder, who also mailed to Benson the promissory note which Andrews had assigned. Mrs. Henry testified she was so upset by the turbulent course of events  Andrews' failure to complete her building and the filing of liens against the property  that she had completely forgotten about the note and second trust deed that had been placed in escrow. Andrews testified he did not realize that the assignment he executed six months earlier was in the escrow. About two weeks later, Mrs. Henry became apprised of the fact that plaintiff was the assignee of the note and deed of trust here involved. She immediately visited him to inform him that Andrews had never completed her building and that the instruments were valueless and asked that they be returned to her. Plaintiff refused to do so. Plaintiff testified he knew that when the note was assigned the interest which was due had not been paid and that there was to be no payment of principal until completion of the building.
Shortly after this escrow was closed, the State Contractors' License Board took action to revoke Andrews' license for misconduct in the Henry transaction. After hearing the charges, the board revoked his license on August 17, 1951. Thereafter, Andrews went into bankruptcy and advised Mrs. Henry to employ another contractor to finish the job. Mrs. Henry engaged one William O'Brien to finish the building. Construction was finally completed in March, 1952, Mrs. Henry paying O'Brien $8,691 to finish the job.
There is some uncertainty as to the amount it actually cost the Henrys to obtain a completed building. The Henrys supply the following tabulation:

 $ 3,700.00  Down payment to Andrews
 9,900.00  Loaned by Travelers
 15,373.00  Mechanics' liens filed and paid
 8,691.00  Paid to O'Brien for finishing building
 900.00  Venetian blinds and landscaping
 __________
Total  $38,564.50

Plaintiff contends that the record does not bear out that Mrs. Henry actually paid the $15,373.50 listed as mechanics' liens, asserting the actual amount paid was about $8,000. Assuming this is correct, this would place the total cost of the building to Mrs. Henry at $31,191. The contract price was $30,700, including the second deed of trust of $9,000 to Andrews. Whether we accept Mrs. Henry's figure of *131 $38,564.50 or the suggestion by plaintiff that would put the cost of the building at about $31,191, in either event Mrs. Henry spent more than the total contract price to have the apartment house built, exclusive of the amount of the second deed of trust. To give effect to that encumbrance would, of course, augment the excess over the contract price which Mrs. Henry has already paid out by an additional $9,000.
Plaintiff's first amended complaint is entitled an action "for declaratory relief, injunction, foreclosures of mechanics' liens, foreclosure of deed of trust and for equitable pro ration" and names as defendants, in addition to the Henrys, Mark Andrews, the Travelers Insurance Company, and the Kales, among others. So far as the problems important to this appeal are concerned, the essence of plaintiff's action is his attempt to enforce payment of the note assigned to him by Andrews and to foreclose the second deed of trust because of the Henry's alleged default in payment.[5] As one of their defenses, the Henrys relied upon a failure of consideration for the note and trust deed. One of plaintiff's principal contentions at the trial was that he took the instrument as a holder in due course, free of any defense which the Henrys might assert against Andrews.
So far as is here material, the trial court found that it was not true that the Henrys and Andrews had agreed that the note and deed of trust would not be effective or operative unless and until Andrews completed the building at a cost not to exceed the price agreed upon in their contract; that the note and deed of trust to Andrews were executed by the Henrys upon good consideration; and that it is not true that the said instruments were either unenforceable or invalid. The court's conclusions, in their pertinent portion, are that "plaintiff and his wife are bona fide and valid assignees and owners of the said note and second trust deed, but are not holders in due course of said note; [and] that there is no defense of failure of consideration as to *132 said note and trust deed in favor of the defendants Henry as against the plaintiffs." (Emphasis added.)
Plaintiff does not challenge the determination of the court that he was not a holder in due course and rests upon his right to recover as an assignee. The Henrys argue that plaintiff is precluded from recovering because Andrews' nonperformance under the building contract resulted in a total failure of consideration. This contention must be sustained.
[1] Absent any circumstances giving rise to an estoppel which an assignee may assert against the obligor, the assignee acquires no greater rights than his assignor and cannot recover upon a claim vulnerable to a defense good as against his assignor. (Alpers v. Hunt, 86 Cal. 78 [24 P. 846, 21 Am.St.Rep. 17, 9 L.R.A. 483]; California Pac. T. & T. Co. v. Bank of America, 12 Cal. App.2d 437 [55 P.2d 533].) Section 3139 of the Civil Code states: "In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable...." Section 3109 of the Civil Code provides: "Absence or failure of consideration is a matter of defense as against any person not a holder in due course; ..." There is frequently, in legal writing, a regrettable tendency to use the term "want of consideration" and "failure of consideration" interchangeably, thus blurring the vital distinction between them. [2] The defense of failure of consideration, in its precise sense, rests not upon facts existing at the time the mutual promises bargained for in a bilateral contract are made but upon some fact or contingency which occurs between the time of the making of the contract and the action thereon which results in the material failure of performance by one party. [3, 4] As stated in Bliss v. California Coop. Producers, 30 Cal.2d 240, 248-249 [181 P.2d 369, 170 A.L.R. 1009]: "Failure of consideration is a good defense to an action on a negotiable instrument by one not a holder in due course. [Citation.] Failure of consideration is the failure to execute a promise, the performance of which has been exchanged for performance by the other party.... `In all executory contracts the several obligations of the parties constitute to each, reciprocally, the consideration of the contract; and a failure to perform constitutes a failure of consideration  either partial or total, as the case may be  within the meaning of section 1689 of the Civil Code.'"
Turning now to the building contract in the present case, Andrews agreed "to construct and complete" a five-unit *133 apartment building for the Henrys, "furnishing all labor, materials, tools, and equipment therefor." The Henrys agreed to pay $30,700, "in consideration of the covenants and agreements ... being strictly ... performed by Contractor, including the supplying of all labor, materials and services required by this Contract, and the construction and completion of the structure ..." In paragraph 5, Andrews covenanted to pay all valid bills and charges arising out of the erection of the building and undertook to pay all liens of record due to unpaid bills in connection with his construction of the building. Paragraph 9 provides that upon the contractor's refusal to furnish all labor and material necessary, the owner may, upon three days' notice, provide the necessary material and workmen to complete the work, "and the expense thereof shall be deducted from said contract price, or if the total cost of the work to owner exceeds the contract price, contractor shall pay to owner upon demand, the amount of such excess ..." Paragraph 6 states: "Contractor shall, if requested, before being entitled to receive the second, or any subsequent payment herewith, furnish to owner all bills paid to that date ... covering work done upon and material furnished for said structure ..." (Emphasis added.)
The Henrys performed all obligations devolving upon them under the contract. They paid Andrews $3,700 in cash as required and Andrews procured $9,900 to begin construction from Travelers Insurance Company as part of their loan commitment of $18,000, for which the Henrys executed a first deed of trust on the property. They also gave Andrews their note for $9,000 secured by a second deed of trust, the contract reciting that payments thereon were "to be $150.00 or more per month beginning at completion of construction." (Emphasis added.)
Unquestionably under the contract Andrews was bound to furnish and pay for all labor and material necessary for the construction and completion of the apartment building. The escrow instructions required him to turn over said building to the Henrys free and clear of all encumbrances except taxes, a first deed of trust for $18,000 and a second deed of trust for $9,000. The Henrys agreed to pay $30,700 for the building. It is patent that when the Henrys executed the note and second deed of trust as a part of the agreed price, it was in consideration of the obligation on the part of Andrews to provide the labor and material necessary to complete *134 the construction. Plaintiff concedes in his brief that "the consideration for that note and trust deed was the promise of Mark Andrews to construct the building." The note and trust deed were executed by the Henrys in contemplation of such future advances by Andrews as would enable him to complete for them the proposed structure. His right to enforce these instruments could arise only to the extent that he had accomplished the promised performance. (Tapia v. DeMartini, 77 Cal. 383, 386-387 [19 P. 641, 11 Am.St.Rep. 288]; City of Santa Monica v. Los Angeles County, 15 Cal. App. 710, 712 [115 P. 945].) [5] This principle is well expressed in I Jones on Mortgages, section 378, page 275: "If the mortgagee advance only a part of the sum contemplated in the mortgage, it is valid security only for so much as he does advance, and for so much only ... When a mortgage is an open one, as for instance one made by an absolute conveyance, or to secure undefined future advances, the mortgagee is entitled to recover under it only so much as he shows affirmatively to be due."
This being so, the essential matter to be established in the instant case is whether the consideration failed in whole or in part and it is clear beyond peradventure that there was a total failure of consideration for the note and deed of trust.
[6a] The finding of the court that at the time the Henrys executed the note and deed of trust "it is not true ... that they agreed with defendant Andrews that the same would not be effective or operative unless and until Andrews completed said building within a specified time and at a cost not to exceed the agreed cost therein" may perhaps be technically justified as a finding that there was no condition precedent to the efficacy of the instruments but it has no validity under the facts on the crucial question of whether or not there was a failure of consideration. Unless Andrews was to complete the building project and pay for the work of the artisans and the supplies of the materialmen during the progress of the construction, then what was he to do for the $9,000? The Henrys agreed to pay the note in anticipation of advances by Andrews required to erect the building; otherwise they would be paying $9,000 for absolutely nothing. But Andrews did not complete the building nor did he pay off any of the some $15,000 in mechanics' liens which were recorded against the building. Instead, having become insolvent, he ceased work on the building, abandoned the contract, advised Mrs. Henry to get someone else to finish the work and shortly *135 thereafter went into bankruptcy and lost his contractor's license. Mrs. Henry was left with the responsibility of discharging various mechanics' liens incurred while Andrews was in charge of construction and of engaging another contractor to finish the work. The total cost to her of completing the building was at least $31,191.50 and possibly as high as $38,564.50. In either event, it was in excess of the price she agreed to pay Andrews, inclusive of the sum evidenced by the note and deed of trust. Mrs. Henry having already disbursed more than the contract price because of Andrews' material breach of contract, Andrews' right to enforce the note and deed of trust against her became extinguished [7] "An owner who has fully complied, upon his part, with the terms of a valid building contract cannot be compelled to pay anything in excess of such contract price [citation]." (Growall v. Pacific Surety Co., 21 Cal. App. 185 [131 P. 73].) [6b] To enforce the note under such circumstances would increase by an additional $9,000 the excess over the contract price which Mrs. Henry has already paid. In addition, the parties to the building contract have themselves, in paragraph 9, provided a yardstick for handling any failure of consideration, viz., by giving the owner a claim or setoff against the contractor to the extent of the cost of completion of the building. That provision of the contract makes it apparent that the owner would be compensated for a breach by the contractor by a credit for the cost of completing the work. Mrs. Henry paid O'Brien $8,691 to complete the building and spent another $900 for Venetian blinds and landscaping, which were to be furnished by Andrews. This more than offset the $9,000 which would have been due Andrews had he not abandoned his contract and completed the building as agreed. It is inescapable from any aspect of the case that there has been a total failure of consideration for the note and deed of trust to Andrews, and the court's determination that there was no failure of consideration is completely contrary to the facts and unsupported by the evidence. Since plaintiff stands in the same position as Andrews, being a mere assignee and not a holder in due course, he was subject to the same defense of failure of consideration as Andrews.
[8] Plaintiff suggests that Mrs. Henry waived the defense of failure of consideration by not rescinding her contract with Andrews after discovering his contractual breaches. He argues that when Mrs. Henry and Andrews caused the second escrow to be closed with the resultant return to her of the *136 property and the recordation of the trust deed and delivery of the note to plaintiff by the escrowholder a novation was thereby effected. There is no merit in this assertion from one who is a mere assignee of Andrews. In returning the property to the Henrys Andrews simply did what he at all times was bound to do, since he was merely holding title in trust for the Henrys. It would have been fruitless to prolong the escrow, since Andrews was insolvent and incapable of fulfilling the contract on which the escrow was based. In agreeing that the Henrys would accept the property subject to the mechanics' liens outstanding (an arrangement for the protection of the escrow holder) the parties executed a memorandum in which it was acknowledged that Andrews continued to be responsible for the discharge of the liens. This showed that no waiver of contract rights was intended by the closing of the escrow. [9] Nor did the Henrys waive their right to rely upon a failure of consideration by failure to announce a formal rescission. As stated in Stone v. Hancock, 44 Cal. App. 365, 366 [186 P. 604]: "The defendants, however, were not required to rescind the transaction out of which said note and mortgage arose, since they had their election under the law either to take affirmative action in the way of rescinding the transaction between themselves and said corporation, or of not taking such action, but of defending against the action of said corporation or its assignee to enforce their obligation upon the ground of ... failure of consideration."
Plaintiff also contends that the Henrys had either actual or imputed notice of the assignment prior to the close of the escrow and may not now assert the defense of failure of consideration occurring after the assignment, especially since not until after the close of escrow did he first acquire knowledge of any claimed invalidity of the note and trust deed [10] The complete answer to plaintiff's contention appears in the following statement in Bliss v. California Coop. Producers, 30 Cal.2d 240, 250 [181 P.2d 369, 170 A.L.R. 1009]: "Plaintiffs urge that the asserted failure of consideration did not occur until after appellants had notice of the transfer of their notes to plaintiffs and thus the failure of consideration is not a defense. The general rule is that an assignee of a chose in action is subject to all equities and defenses existing at or before the notice of the assignment. (Civ. Code, § 1459; Code Civ. Proc., § 368; 3 Cal.Jur. pp. 286-289.) But where there is a failure of consideration under a bilateral contract consisting of a breach by the *137 assignor, such failure is a good defense to an action by the assignee whether it occurred before or after the notice of assignment. It is said: `On the other hand, payment to the assignor or other defenses acquired by the debtor against the assignor after notice of the assignment are invalid, unless the defense, though acquired after notice, is based on a right of the defendant inherent in the contract by its terms. Thus if payments under an executory contract are assigned, the debtor may set up failure of the assignor to fulfill his part of the contract though such failure occurs after notice of the assignment, for the assignor cannot give another a larger right than he has himself; ...' [citation]." At page 251 the court continues: "In the instant case, assuming that plaintiffs were not holders in due course because of notice of nonpayment of the installment, the availability of the defense here asserted is not dependent upon actual notice of equities in favor of appellants. The general rule has been repeatedly stated that an assignee of a note who is not a holder in due course takes subject to all defenses that would be available against the assignor, one of such defenses being failure of consideration."
Finally, plaintiff asserts that the doctrine of estoppel should be applied to sustain the judgment. The first amended complaint upon which the issues were joined is barren of any allegations in support of the estoppel theory. At the conclusion of the trial, plaintiff was permitted to amend his pleading to allege that "the defendants are estopped by their conduct from asserting any invalidity of said promissory note and trust deed ..." The court made no finding on the question of estoppel nor did it conclude as a matter of law that defendant was or was not estopped "from asserting any invalidity of said promissory note and trust deed." [11a] Plaintiff urges this court to exercise its power under section 956a of the Code of Civil Procedure to make a finding in the matter of estoppel in conformity with one proposed by him.[6] We do not agree that this is a proper case in which to make the requested finding.
The substance of plaintiff's request is that this court make an independent finding that the Henrys are estopped from interposing against plaintiff, an assignee, the defense of *138 failure of consideration. [12] The manifold cases passing on the law of equitable estoppel have established the following factors as the principal elements of this doctrine: (1) there must be acts or conduct on the part of the party to be estopped which amount to a representation or concealment of material facts made either with knowledge or culpable negligence: (2) he must intend that his conduct shall be acted upon or must so act as to cause the other party reasonably to believe it was so intended; (3) the other party must be ignorant of the true situation; and (4) he must rely upon that conduct to his prejudice or injury. (18 Cal.Jur.2d, Estoppel, § 5, p. 406.) Section 1962, subdivision 3, of the Code of Civil Procedure provides: "Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot in any litigation arising out of such declaration, act, or omission be permitted to falsity it." The court adopted no finding in regard to estoppel, nor is there any basis for implying such a finding since it is obvious that the court did not attempt to decide the question. Without attempting to single out specific items of evidence, since we do not intend to make a finding on this question of fact nor influence the proceedings below upon a retrial, it is enough to state that our examination of the record discloses that a finding against estoppel would have been fully supported by the evidence. In A. Farnell Blair Co. v. Hollywood State Bank, 102 Cal. App.2d 418, 434 [227 P.2d 529], where the reviewing court declined to make a finding on estoppel, the court stated: "An estoppel necessarily results when ... [the] factual basis has been established. [11b] Unless the several elements of estoppel are established by unconflicting evidence or by findings of a trial court the rule cannot be applied on appeal. Defendant's contention that we should hold as a matter of law that plaintiff is estopped is just as untenable as plaintiff's contention that we should hold to the contrary. The issue must be retried. The failure of the court to make findings upon this affirmative defense would, in itself, require a reversal of the judgment." This states the rule applicable to the instant case in the state of the record before us.
The judgment is reversed.
Moore, P.J., and Ashburn, J. pro tem.,[*] concurred.
NOTES
[1] This is the deed of trust here involved. Subsequent to the execution of the contract Travelers agreed to advance $18,000 as a construction loan instead of the anticipated $17,000. The amount of the second trust deed to Andrews was accordingly reduced to $9,000 in keeping with the contract price of $30,700.
[2] The contract between the parties was on a form used by the Building Contractors' Asociation of California. In addition to paragraph 3 previously referred to, the following provisions are pertinent:

"1. Contractor agrees to construct and complete in a good and workmanlike and substantial manner ...
"2. The structure is to be constructed and completed in strict conformance with plans and specifications ...
"5. Contractor shall promptly pay all valid bills and charges ... in connection with or arising out of the construction of said structure, and will hold owner of the property free and harmless against all liens and claims of lien for labor and material ... Should any liens or claims of lien be filed for record against the property, or should owner receive notice of any unpaid bill or charge in connection with the construction, Contractor shall either forthwith pay and discharge the same and cause the same to be released of record, or shall furnish owner with proper indemnity ...
"6. Contractor shall, if requested before being entitled to receive the second, or any subsequent payment herewith, furnish to owner all bills paid to that date, properly receipted and identified covering work done upon and material furnished for said structure ...
"9. Should Contractor ... refuse or neglect to supply sufficient material or workmen for the expeditious progress of said work, Owner may, upon giving three days notice ... provide the necessary material and workmen to finish the said work and enter upon the premises for such purpose and complete said work, and the expense thereof shall be deducted from said contract price, or if the total cost of the work to owner exceeds the contract price, contractor shall pay to owner upon demand, the amount of such excess in addition to any and all other damages to which owner may be entitled ..." (Emphasis added.)
[3] The assignment, signed by Andrews and his wife, was written on the back of the note as follows:

"Long Beach, California January 19, 1951 For value received, we hereby assign and transfer to CLEON E. BENSON, JR. and MILDRED T. BENSON, husband and wife, as joint Tenants, the within note and the Deed of Trust securing same, together with all rights accrued or to accrue thereunder, without recourse."
[4] Part of Andrews' obligation of $8,299.50 so removed from the books composed a debt for cabinet work installed in a building Andrews was constructing for a party named Kales. This debt amounted to $3,961. In May, 1951, at Andrews' request, plaintiff delivered to him a full waiver of mechanic's lien with respect to the Kales job.
[5] One of plaintiff's causes of action was to foreclose a mechanic's lien of $3,961 against the Kales' property, claiming that the waiver of lien given by him on May 8, 1951, at Andrews' request was invalid for want of consideration. This was made possible by an agreement between plaintiff and the Henrys under which plaintiff agreed to credit the amount, less expenses, recovered thereunder on the note secured by the deed of trust, while the Henrys agreed not to assert the claim of estoppel or election of remedies against him in the event he was unsuccessful against the Kales and later sought to foreclose the second deed of trust. The Kales prevailed on this count.
[6] Plaintiff's proposed finding on the issue of estoppel reads: "That the defendants Andrews and Henry are estopped by their conduct from asserting any invalidity of said promissory note and trust deed securing the same as against plaintiff-respondent Cleon E. Benson."
[*] Assigned by Chairman of Judicial Council.