## In re ALLIANCE PROPERTIES, INC., a California corporation, Debtor.

### Bankruptcy No. 87–00571–LM11.

United States Bankruptcy Court, S.D. California.

Aug. 23, 1989.

---

Janet Krems, Montgromer, Gascou, Gemmill & Thornton, Los Angeles, Cal., for plaintiff, INA.

Darvy Mack Cohan, La Jolla, Cal., for debtor.

Ted Graham, Brobeck, Phleger and Harrison, Mikel Bistrow, Luce, Forward, Hamilton & Scripps, San Diego, Cal., for Torrey Pines Bank.

Charles G. Crosse, IV, Michael, Best & Friedrich, Milwaukee, Wis., for John Junge.

David Buchbinder, San Diego, Cal., for Seligman and Coleman.

James P. Hill, Hill & Baskin, San Diego, Cal., for Patrick J. Timmons.

## MEMORANDUM DECISION

LOUISE DeCARL MALUGEN,
Bankruptcy Judge.

### I. INTRODUCTION

This case is essentially an ownership dispute between Torrey Pines Bank ("TPB"), a secured creditor, Alliance Properties, Inc. ("API"), the debtor-in-possession, and Insurance Company of North America ("INA"), a surety for the debtor on several bonded federal government contracts. The asset in question is a fund of $375,000 held in a blocked account pursuant to an order of this Court approving a certain contract settlement with the government. TPB holds a security interest in the debtor's pre-petition accounts receivable, including contract proceeds, and a first priority lien in all post-petition receivables via a cash collateral order approved by this Court. INA asserts an equitable lien in the fund for having paid, post-petition, the remaining claims of various suppliers and subcontractors on the settled contract.

The dispute is before the Court by way of INA's Motion for Order Releasing Segregated Funds. The Court finds that INA's motion is well-taken and directs the immediate release of $273,390.65 to INA from the blocked account, with the balance of the fund to be remitted to TPB.

### II. FACTS

#### A. *The Bankruptcy Proceedings.*

The debtor was engaged in the performance of several government contracts bonded by INA pursuant to the Miller Act, 40 U.S.C. § 270a *et seq.* (1982). The debtor encountered serious performance difficulties on a maintenance contract for Randolph Air Force Base (the "Randolph contract") and these difficulties were, in large part, responsible for its Chapter 11 filing on January 26, 1987.

API continued to operate the business post-petition under a cash collateral agreement with TPB. The agreement authorized API to take additional draws on a pre-petition line of credit to fund its operations. In return, API granted TPB a first priority security interest in the post-petition receivables, including the Randolph contract proceeds. The Court approved the agreement on April 3, 1987, after a hearing

on notice to all creditors.[1] Neither the original moving papers, notice of hearing nor the final cash collateral order were ever served on INA.

API and the government eventually resolved the performance difficulties on the Randolph contract by executing an amendment to the contract which required the government to make an additional lump sum payment of approximately $1.2 million to the estate. API then brought a motion to approve the amendment which was granted by the Court at a hearing held on October 17, 1988. The Court further ordered API to deposit the bulk of the payment in a blocked account pending INA's motion to determine its surety rights in these proceeds.

INA brought the motion on January 12, 1989, requesting the release of $840,000 from the account as compensation for its total payments to suppliers and subcontractors on several bonded contracts of the debtor. The Court denied this motion but continued the matter for an evidentiary hearing on May 31, 1989, to consider INA's alternate request for the release of funds attributable to payments made under the bond on the Randolph contract. The Court then directed API to release all but $375,000 of the funds to TPB. The balance was reserved pending hearing on INA's continued motion.

In preparation for the continued hearing, the Court directed the parties to complete discovery by May 1, 1989, and to prepare and file supplemental memoranda. The parties chose not to introduce testimonial evidence at the hearing and, instead, relied upon their previous pleadings, supplemental declarations and final oral arguments presented at the continued hearing.

B. *The Record Before The Court.*

The record in this case reveals that the parties are in substantial agreement over most of the essential facts of this dispute. The debtor is a contractor, primarily in the business of constructing, repairing and maintaining military housing units for the federal government. On October 2, 1984—one week after the debtor was awarded the contract—INA posted performance and payment bonds on the Randolph contract, as required by the Miller Act which governs government contracts of this nature. Although the Court has not been provided with a complete copy of the contract, the excerpted portions of the payment provisions show that the government was obligated to make progress payments to API as the work proceeded and entitled to retain up to 10 percent of the progress payment to secure the debtor's complete performance.

Within months after work commenced, the debtor began experiencing performance problems in the form of various disruptions and delays allegedly due, in part, to the government's failure to provide adequate plans and specifications and failure to cooperate with the debtor's efforts to resolve problems encountered on the job. After incurring substantial, additional costs on the job, the debtor filed this Chapter 11 petition.

On March 13, 1987, a little over a month after the petition was filed, API submitted a claim to the government for an equitable adjustment to the contract as compensation for both the additional costs and the government's alleged breach of contract. The claim was presented in the form of a letter to the government's contracting officer for the Randolph contract, generally summarizing the basis for the adjustment. The letter also refers to an appendix which purportedly sets forth the itemization of charges and the total amount of the claim. The appendix was never filed with the Court. However, TPB and API have previously represented to the Court that API was seeking approximately $1,385,324 for the added costs and "in excess of $5 million" for the contract damages.[2] API has

---

1. An interim order (presented by way of *ex parte* application pending the final hearing) was entered March 2, 1987. After a hearing on the parties' motion to approve their cash collateral stipulation, the Court entered a final order on April 3, 1987.

2. See Joint Application of TPB and Debtor for Order Shortening Time; Stipulation for Use of Cash Collateral filed March 2, 1987.

verified these amounts for each portion of the claim in a "Quantum Summary" submitted with its supplemental opposition to INA's motion.

API and the government resolved their dispute on September 30, 1988, and their agreement is memorialized by an "Amendment of Solicitation/Modification of Contract" (the "Amendment"). The Amendment awards API an additional sum of $1,249,094 and states that it is to be a "complete equitable adjustment for the [debtor's] claims" as well as a complete release of liability. The Amendment does not set forth the precise basis for the additional costs and contract damages. The record is inconclusive on this issue.

INA asserts that the award is an equitable adjustment to the contract to compensate API for its additional costs incurred in the performance of the contract. TPB and API argue that the award is for money damages paid in settlement of a breach of contract claim. They offer the declaration of debtor's president, V. Allan Johnston, which states that all sums originally owed on the contract have been paid and that the purpose of the claim was to obtain damages for the government's breach of contract. There is no evidence of the government's intent in making the award.

Prior to the Amendment, the debtor defaulted in making payments to the suppliers and subcontractors employed on the Randolph contract. The parties agree that INA paid these claimants $273,390.65, post-petition, between May 5, 1987 and December 22, 1987. The record is unclear as to whether these payments were for pre- or post-petition services. Counsel for INA asserts that most, if not all, of these claims were incurred pre-petition, and Allison Schooley, Surety Bond Claims Representative for INA, declares that INA first received demands from these Miller Act claimants post-petition.

There is no agreement among the parties over the existence of contract retentions. INA, relying on the Declaration of Donald J. Smith, the government's contracting officer on the Randolph contract, asserts that as of January 8, 1988, the government was holding $22,843, or one percent of the completed contract. On the other hand, the debtor's president maintains that all sums due under the Randolph contract have been paid and there are now no contract retentions. He does acknowledge that the government has uncovered an additional amount of $10,706.29 owing on the contract, which is still retained in a separate account.

As to the competing interests of TPB, the record indicates that on or about June 10, 1986, TPB acquired a blanket security interest in the debtor's assets, including all accounts receivable and proceeds. This pre-petition security interest was designed to secure a line of credit in the amount of $2 million. Although the bank has not set forth the full amount of its secured claim, neither API nor INA contest its assertion that its unpaid secured claim exceeds the remaining $375,000. In addition, as previously mentioned, the Court approved a cash collateral order granting TPB a lien in the post-petition receivables, which expressly includes all proceeds derived from the Randolph contract.

### III.  ISSUES

I.  Whether INA has an equitable lien in the fund by virtue of its post-petition bond payments to the subcontractors on the Randolph contract; and,

II.  Whether INA's lien is paramount to all other interests in the fund.

### IV.  DISCUSSION

A.  *Procedural Matters.*

█ The Court must first address the procedural irregularity presented by INA's motion. This dispute has proceeded by way of contested motion under B.R. 9014 rather than adversary proceeding, as is normally required under B.R. 7001. Bankruptcy Rule 7001(2) provides that "an action to determine the validity, priority, or extent of a lien or other interest in proper-

ty" must be commenced by adversary complaint. I previously authorized INA's motion in my order approving the contract adjustment. I find that I have authority to consider this dispute by way of motion, since the debtor and TPB have consented to this procedure and I have provided the parties with a full and fair opportunity to conduct discovery and prepare and present their cases. *In re Great Lakes Steel & Fabricating Industries,* 83 B.R. 1015 (Bankr.N.D.Ind.1988).

The Court finds that this controversy is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K), and that this Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and General Order 312–D of the United States District Court for the Southern District of California.

### B. *The Applicable Legal Precedent.*

The principal cases cited by the parties are *Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed. 190 (1962) and *In re E.R. Fegert, Inc.,* 88 B.R. 258 (9th Cir. BAP 1988). In *Pearlman,* the Supreme Court ruled that a surety under the Miller Act, compelled to discharge the debtor/contractor's pre-petition debts to subcontractors, held an equitable interest in the contract retentions due the contractor. 371 U.S. at 141, 83 S.Ct. at 237. This interest is superior to the interests of the trustee in bankruptcy. *Id.*

In *Pearlman,* the contractor defaulted in making payments to subcontractors, and the government terminated the contract pre-petition. After the surety paid the claims of subcontractors, the contractor filed for liquidation. The surety then moved to enforce its subrogation rights against the remaining contract retentions withheld by the government but owing to the contractor for prior completed work. The government turned the fund over to the trustee pending the surety's motion. *Id.* 371 U.S. at 134, 83 S.Ct. at 233.

In preferring the surety's claim over the trustee's interest, the Court reasoned that the surety was subrogated to the rights of the government which included the right to withhold payment until the subcontractors were paid. Since the surety had paid the claims, the Court determined that the fund belonged to the surety and was not property of the estate to be administered to the contractor's general creditors. *Id.* at 141, 83 S.Ct. at 237.

In *Fegert,* the Bankruptcy Appellate Panel utilized the *Pearlman* doctrine to find that a debtor/contractor's payments to subcontractors, in exchange for their releases of the surety, constituted new value so as to exempt otherwise preferential payments from avoidance under § 547 of the Bankruptcy Code. 88 B.R. 258, 260. Critical to this conclusion was the finding that under the Miller Act the surety, upon making payments to the bonded subcontractors, acquired an equitable lien against any unpaid contract balances owed to the debtor. *Id.* Because the lien was also superior to the interests of the estate, the court concluded that its release would constitute new value.

It is noteworthy that in *Fegert* the trustee argued that the *Pearlman* doctrine was inapplicable since it only applied to contract retentions rather than to unpaid progress payments. *Id.* at 261. The panel rejected this argument stating that the distinction was meaningless, particularly in the context of a Chapter 7 liquidation where the trustee is not attempting to perform the contract. *Id.*

### C. *INA's Equitable Lien Rights.*

INA asserts that *Fegert* and *Pearlman* are controlling here. These decisions hold that to the extent that INA cured the debtor's defaults to the subcontractors, it obtained a superior equitable lien in any unpaid contract proceeds. The fund consists of contract proceeds in the form of a final settlement of the debtor's remaining contract claims against the government for work performed on the project. The government has the right—and, indeed, an obligation under the Miller Act—to first apply the proceeds to the unpaid claims of the subcontractors. INA is, as a matter of equity, subrogated to this right once it pays the subcontractors' claims, and this

right is superior to any rights of the defaulting contractor and/or the estate.

TPB argues that *Fegert* and *Pearlman* are inapplicable to the present case, claiming that the fund is composed of contract damages rather than progress payments or retentions, and that the debtor's breach of contract claim is property of the estate under § 541(a)(1) of the Bankruptcy Code. Moreover, TPB asserts that INA's subrogation rights only entitle it to step into the shoes of the unpaid subcontractors who hold unsecured claims against the state. TPB has a valid pre-petition security interest in these proceeds and a superior interest in all receivables acquired by API post-petition. INA should not be permitted to bootstrap its subrogation rights to a super-priority administrative claim.

I conclude that INA is entitled to assert an equitable lien against this fund. INA has demonstrated that: The contractor has defaulted in making payments to the subcontractors; INA has paid these claims; and, the debtor-in-possession is now holding segregated funds which were due the debtor for work performed on the bonded contract. *In re Fegert, supra,* 88 B.R. at 260; *California Bank v. United States Federal & Guaranty Co.,* 129 F.2d 751, 754 (9th Cir.1942); *In re Dutcher Constr. Corp.,* 378 F.2d 866, 870 (2d Cir.1967); *Nat'l. Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843 (1st Cir.1969).

TPB concedes that the debtor has not paid the subcontractors on the Randolph contract and, as a result of this default, INA has satisfied these claims. While the record is not clear as to which portion of this fund is attributable to retentions, progress payments or contract damages, resolution of this uncertainty is not crucial. *See, In re E.R. Fegert, Inc.,* 88 B.R. at 266. The inescapable fact is that the fund is a part of the final payment on the Randolph contract.

The basis for INA's lien is that the surety is equitably subrogated to the government's right to withhold payments from the contractor and to apply them to the unpaid claims of the subcontractors. *Henningsen v. United States Fidelity & Guar-*anty *Co.,* 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); *California Bank v. United States Fidelity & Guaranty Co.,* 129 F.2d at 754. This lien is created in equity, to prefer the claims of subcontractors, materialmen and their sureties over the general creditors of the contractor, since their services have contributed to the contractor's performance and they are not afforded the same protections as similarly situated claimants in private construction and maintenance contracts. *In re E.R. Fegert, Inc.,* 88 B.R. at 260; *In re Dutcher Constr. Corp.,* 378 F.2d at 870 (purpose of the equitable lien is to provide laborers and materialmen the functional equivalent of a mechanic's lien). The government had an obligation to withhold from the final payment to API money sufficient to satisfy the unpaid claims of the subcontractors who worked on the Randolph contract. INA discharged this obligation and was subrogated to this right. This right was a cumulative right or remedy afforded INA under the contract and in addition to any other rights it could have claimed through the subcontractors themselves.

In the absence of a bankruptcy, INA's lien would prevail over the security interests of TPB. It is well established that the surety's equitable lien relates back to the time in which the bonds were executed. *Prairie State National Bank v. United States,* 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); *California Bank v. United States Fidelity & Guaranty Co., supra; Balboa Ins. Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985). INA's bonds on the Randolph contract predate TPB's security interests by almost two years. INA is not required to file a financing statement to perfect this inchoate lien since it exists as a matter of equity rather than by contract. *Nat'l. Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d at 846; *In re V. Pangori & Sons, Inc.,* 53 B.R. 711, 717 (Bankr.E.D.Mich.1985) (interpreting similar subrogation rights under Michigan statute). Moreover, when the debtor defaulted in making payments to its subcontractors, it subordinated its rights in the fund to the government and its subrogee, INA. The debtor cannot assign to TPB rights that it

does not possess. *Nat'l. Shawmut Bank v. New Amsterdam Casualty Co.*, 411 F.2d at 848.

The parties devote major portions of their pleadings to the issue of whether this fund is property of the estate. I conclude that the fund is included within the property of this estate but find that, under the facts of this case, this conclusion does not change the ultimate outcome.

In *Pearlman*, the Supreme Court found that contract retentions which were subject to a surety's equitable lien were not property of the estate under the Bankruptcy Act. 371 U.S. at 141, 83 S.Ct. at 237. Section 541 of the Bankruptcy Code (adopted after *Pearlman*) has substantially expanded the definition of property of the estate to include all legal and equitable interests of the debtor. 11 U.S.C. § 541(a); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *In re Glover Constr., Inc.*, 30 B.R. 873 (Bankr. W.D.Ky.1983). In addition, § 541(d) provides that property in which the debtor has only a legal interest is property of the estate. *In re Sierra Steel, Inc.*, 96 B.R. 271 (9th Cir. BAP 1989).

In the context of this dispute, the fund must be regarded as property of the estate but subject to the equitable lien of the surety. The fund is analogous to the corpus of a trust held by the estate for the benefit of the subcontractors and/or the surety. As a general proposition, the debtor may hold a legal interest in the proceeds and be entitled to use the fund to complete the contract in the course of its efforts toward reorganization. *See, In re Glover Constr., Inc.*, 30 B.R. 873, 881. However, in the present case, the debtor has completed the contract and the final proceeds are to be distributed to the debtor.

This result is fair, despite the possible benefit conferred on INA by the debtor's use of the loan proceeds from TPB. TPB could have inquired about the existence of API's surety bond obligations prior to offering a line of credit to the debtor and was, therefore, in the superior position to evaluate the risks presented by extending credit to the debtor for its operations.

INA issued the bonds prior to TPB's secured financing and had no prior notice of the cash collateral order.

For these reasons, I hold that INA has established an equitable lien in the remaining fund in the amount of $273,390.65, and that this lien is superior to the claims of API and TPB. API is directed to release this sum to INA and the balance of the fund to TPB. Counsel for INA is directed to prepare and submit an order in conformance with this Memorandum Decision within ten (10) days of its entry.