In re COLT ENGINEERING, INC., Debtor.

Sandra L. Bendon, Chapter 7 Trustee, Plaintiff.

v.

Andrade & Associates, a professional law corporation, Ulico Casualty Company, Defendant.

Ulico Casualty Company, Cross–Complainant.

v.

Sandra L. Bendon, Chapter 7 Trustee, Andrade & Associates, a professional law corporation; Merrill Lynch Business Financial Services, Inc.; U.S. Rentals, Inc., Cross–Defendants.

Bankruptcy No. RS 00–16583 MJ. Adversary Nos. RS 00–1366 MJ, RS 01–1094 MJ, RS 01–1146 MJ.

United States Bankruptcy Court, C.D. California.

Jan. 28, 2003.

Sandra Bendon, Rancho Mirage, CA, Chapter 7 Trustee.

Anthony J. Vitulli, Riverside, CA, for debtor.

## AMENDED MEMORANDUM OF DECISION

MEREDITH A. JURY, Bankruptcy Judge.

These related adversary proceedings came on regularly for trial on July 9, 2002, before the honorable Meredith A. Jury. Cross-complainant Ulico Casualty Co. appeared through counsel Wilson, Elser, Moskowitz, Edelman & Dicker LLP by

John J. Immordino; cross-defendant Merrill Lynch Business Financial Services, Inc. appeared through counsel Frandzel, Robins, Bloom & Csato, L.L.C. by Thomas S. Arthur; defendant and cross-defendant Andrade & Associates appeared through counsel Andrade & Associates by Frank A. Satalino and Snipper, Wainer & Markoff by Maurice Wainer; and Trustee Sandra Bendon appeared through Danning, Gill, Diamond & Kollitz, LLP by Robert Hessling and Matthew Kennedy. Evidence, both oral and documentary, was received and argument of counsel presented. The matter was then submitted for post-trial briefs, which were filed on or before August 12, 2002, at which time the matter was submitted for decision. Good cause appearing therefore, the court submits the following memorandum of decision, which shall be deemed the findings of fact and conclusions of law as allowed by Federal Rule of Bankruptcy Procedure 7052(a).

## I.

### SUMMARY OF FACTS AND ARGUMENT

Debtor Colt Engineering filed a voluntary petition under chapter 7 of the Bankruptcy Code on April 28, 2000. Sandra L. Bendon is the duly appointed chapter 7 trustee. The court has jurisdiction over these combined adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(H) and 1334. These actions are core proceedings under 28 U.S.C. § 157(a)(2)(A), (E),(F),(H),(K) & (O).

On December 11, 1997, Colt entered into a written sub-contract agreement with Biltmore Construction Corporation to perform specified work at the San Diego Town Center (the San Diego project). On

November 25, 1997, Ulico Casualty Company issued a subcontract performance and payment bond no. B97–114170, which named Biltmore as obligee and which assured payment for all labor performed and materials furnished to the San Diego project. Certain suppliers on the San Diego project asserted that Colt failed to pay them for all labor and materials supplied to the project[1]. Each of these suppliers recorded a mechanic's lien against the San Diego project and perfected its mechanic's lien by filing the necessary lawsuit within the statutory period. Each of these suppliers refused to release its mechanic's lien until it was paid in full on its claims. No competent evidence was presented at trial to refute the validity of any of these claims. In compliance with the performance bond it issued, Ulico paid a total of $296,811.34 to these four claimants on the San Diego project. Payments were all made prior to the chapter 7 filing by Colt and prior to the settlement of the San Diego project, which settlement was consummated in approximately December, 1999 for $375,000. Prior to settlement of the San Diego project, Andrade & Associates on behalf of Colt commenced litigation against Biltmore and others, asserting that Colt was entitled to recover money based on its subcontract agreement with Biltmore. Andrade was attorney of record for Colt at the time the settlement was achieved.

On February 16, 1998, Colt entered into a written subcontract agreement with RB & G Construction Company to perform specified work at the Glendale Fashion Center (Glendale project). On March 17, 1998, Ulico issued its subcontract labor and material payment bond no. B98–114342, which named RB & G as an obli-

---

[1]. Burns & Son Trucking asserted a claim for $265,000.00; Cosby Oil Company a claim for $17,846.30; Rebel Rents a claim for $3,965.04; and Steve Lowe dba CRG Construction Company a claim for $10,000.00.

gee and which assured payment for all labor performed and materials furnished by Colt to the Glendale project. Certain suppliers alleged that Colt failed to pay them in full for labor and materials furnished to the Glendale project [2]. All of these contractors, with the exception of Southern Counties Oil, recorded mechanic's liens against the Glendale project. All of these contractors, including Southern Counties Oil, refused to give lien releases on the project until they were paid in full. No competent evidence was presented at trial to refute the validity of any of these claims. Ulico paid a total of $138,189.49 to these five claimants on the Glendale project.

Andrade commenced litigation on behalf of Colt against RB & G and others in connection with the Glendale project. Despite efforts by Andrade, this litigation was not settled until after the bankruptcy was commenced [3]. The payments made by Ulico to the five claimants were all made prior to the bankruptcy proceeding and prior to the settlement agreement.

On August 28, 1997, Colt entered into a written subcontract agreement with RB & G to perform specified work at the Long Beach Town Center project (Long Beach project). On September 11, 1997, Ulico issued its subcontract labor and material payment bond no. B97–014056, which named RB & G as obligee and which assured payment for all labor performed and materials furnished to the Long Beach project by Colt. Certain suppliers alleged

that Colt failed to pay them in full for labor and material supplied to the Long Beach project [4]. No competent evidence was presented at trial to refute the validity of any of these claims. Ewles, Mad Dog, United Rentals and Jagur recorded mechanic's liens against the Long Beach project. All of the six contractors refused to grant lien releases until they were paid in full for their work on the Long Beach project. Ulico paid a total of $124,925.33 to these six claimants, all prior to settlement of the Colt litigation.

Andrade filed suit on behalf of Colt against RB & G and others in connection with the Long Beach project. Although attempts were made, Andrade was unsuccessful in settling the Long Beach litigation prior to the commencement of the bankruptcy proceeding. Special counsel for the trustee achieved the settlement during the bankruptcy proceeding, netting $100,000.00.

In July 1998, for value received, Colt executed and delivered to Merrill Lynch Business Financial Services a WCMA Note, Loan and Security Agreement. Colt granted Merrill Lynch a security interest based on the WCMA Agreement in certain personal property assets, including inventory, equipment, fixtures, general intangibles and accounts. In August 1998, Colt executed and delivered to Merrill Lynch a Term WCMA Reducing Revolver Loan and Security Agreement. In August 1998, Colt granted Merrill Lynch a security interest based on the Revolver Agreement in

**2.** Senna Tree Company asserted a claim for $6,070.00; Southern Counties Oil Company a claim for $2,923.20; United Rental a claim for $3,125.52; Tri–State Restoration a claim for $100,000.00; and UB Equipment/Dependable Equipment a claim for $26,070.77.

**3.** Special counsel for the trustee achieved a settlement in the sum of $190,000.00 during this bankruptcy proceeding.

**4.** Ewles Materials asserted a claim for $10,051.51; Five Star Labor/Golden Arrow a claim for $10,423.41; Mad Dog Water Trucks a claim for $1,354.85; Southern Counties Oil Co. a claim for $26,008.35; United Rentals a claim for $21,242.21; and Jagur Trucking a claim for $55,845.00.

certain personal property assets, including accounts, inventory, equipment, general intangibles and fixtures. On August 20, 1998, Merrill Lynch perfected its security in the collateral described in the WCMA Agreement and the Revolver Agreement by filing a UCC–1 Financing Statement with the California Secretary of State. In February 2001, Merrill Lynch filed both a secured and an unsecured claim for the sum of $659,328.43 in the Colt bankruptcy proceeding, based on the WCMA Agreement, the Revolver Agreement, and the other security documents. The Trustee at trial stipulated to the validity of the Merrill Lynch claim. Ulico and Andrade refused such a stipulation. Merrill Lynch did not prove at trial the validity of the amounts claimed due under the two notes and security agreements.

Ulico asserted a right to the sums received in settlement of the San Diego, Glendale project, and Long Beach projects on a theory of equitable subrogation. It argued that the amounts it paid to the labor and material claimants on the three projects were payments on contract funds due to Colt under the three contracts and that the funds paid were never property of the estate, instead belonging directly to Ulico under its equitable subrogation theory. Merrill Lynch asserted that the funds paid in settlement of all litigation were property of the bankruptcy estate under § 541 of the Bankruptcy Code, subject to the first priority security interest of Merrill Lynch based on the WCMA Agreement, the Revolver Agreement, and the related security documents recorded by Merrill Lynch. Merrill Lynch argued that Ulico was merely an unsecured creditor, standing in the shoes of the claimants whose claims were paid, not in the shoes of

the owners of the project. Merrill Lynch further asserted that the funds received in settlement of the projects were not withheld funds or retained funds, such that they were subject to the equitable subrogation argument of Ulico. Andrade joined the arguments of Merrill Lynch in opposing Ulico's equitable subrogation claim. It also asserted an attorney's lien on all settlement proceeds for the full amount of attorney's fees due for services performed by Andrade on approximately thirty different Colt litigation accounts, including the San Diego project, the Glendale project, and the Long Beach project. Andrade asserted that it held a charging lien or retaining lien on the funds. It also argued that other equitable theories would entitle it to first right to the proceeds from the litigation it handled on behalf of Colt.

The trustee took no active part in the litigation other than supporting the position asserted by Merrill Lynch and stipulating to the secured claim of Merrill Lynch. Prior to commencement of trial, the trustee had dismissed its complaint and participated in the litigation only as a cross-defendant and defendant. Trustee's special counsel was responsible for the settlements which resulted on the Glendale project, the Long Beach project, the RHI settlement, and the City of Glendale project[5].

## II.

### SUMMARY OF DECISION

The court has been asked to determine the relative claims of surety Ulico, former attorney for debtor Andrade, secured creditor Merrill Lynch, and trustee Bendon in monetary funds paid in settlement of various construction contract claims of the debtor as follows: $375,000.00 deposit-

---

5. The RHI and City of Glendale settlements were achieved during the bankruptcy and are    not subject to any Ulico claims.

ed with Los Angeles Superior Court as settlement of the San Diego project; $190,000.00 held by the trustee as settlement of the Glendale project; $100,000.00 held by the trustee as settlement of the Long Beach project; $25,000.00 held by the trustee as settlement of the RHI project; and $147,500.00 held by the City of Glendale as settlement of the City of Glendale project. The court finds that Ulico, as surety of debtor on the San Diego, Glendale, and Long Beach projects, is entitled to receive $275,000.00 from the settlement funds on the San Diego project; $138,189.49 from the settlement funds on the Glendale project; and $100,000.00, the entirety of the settlement funds on the Long Beach project, for a total of $513,189.49. Andrade, as a result of a charging attorney's lien [6], is entitled to $100,000.00 of the funds from the settlement of the San Diego project.

Except as to trustee Bendon, Merrill Lynch did not establish a right to recovery as a secured creditor of the estate in this litigation. However, because the trustee has stipulated to the validity of the Merrill Lynch secured claim filed with the court, the balance of funds, $224,310.51, shall be awarded to Merrill Lynch, subject to the court's decision on the trustee's 506(c) motion, which determination will be made in approximately two weeks from the date of this decision. The reasoning behind the court's ruling is set forth below.

### III.

### *ULICO IS ENTITLED TO A PORTION OF THE SETTLEMENT FUNDS BECAUSE ALL PAYMENTS WERE FINAL PAYMENTS UNDER THE COLT SUBCONTRACT*

■ As recited above, Ulico made payments under its performance and material

bonds on the three subject projects to the labor and material suppliers not paid in full by Colt. Ulico presented competent evidence that claims were validly made by each of the claimants, the majority of whom had recorded mechanic's liens against the subject projects. Each of the claimants had refused to issue a lien release, as required by the controlling contracts, prior to payment in full. In each instance, Ulico made payments to the claimants before the settlement of the litigation which resulted in the settlement funds. Lien releases from the subcontractors were required as a condition of each settlement. Without the payments made by surety Ulico, which procured the lien releases from the claimant, it is highly unlikely that settlement funds would have been forthcoming on any of the projects. It is equally unlikely there would have been any funds in which the bankruptcy estate could assert an interest under § 541. To this court, the participation by Ulico in paying the claimants was a necessary element before the final payments under the contracts issued. Without Ulico's payments, no money (or equivalently less money) would have been paid in settlement.

The principle asserted by Ulico was established by the United States Supreme Court in *Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). In *Pearlman*, the Supreme Court held that the surety of a government contractor whose contract was terminated by agreement and whose job was completed by another, upon payment by the surety of the contractor's laborers and materialmen, was subrogated (a) to

---

**6.** Other theories asserted by Andrade & Associates might also entitle it to the sum of

$100,000.00 from the San Diego project.

the rights which the government had to use retained funds to pay the laborers and materialmen, (b) to the rights which the laborers and materialmen had to be paid, and (c) to the rights which the contractor would have had if the contractor completed the job. In other words, a surety was subrogated to the rights of the owner/government, the claimants, and the contractor to contract funds remaining with the government. *Pearlman* was a Miller Act case where the federal government was the owner of the project and the funds to which the surety was entitled were retained funds under the contract's retention clause, but the principle of *Pearlman* has been extended by case law to many other circumstances. Although many of these cases have arisen under federal law (often specifically bankruptcy cases), the underlying state law is key to any subrogation decision.

In *A. Farnell Blair Co., Inc. v. Hollywood State Bank,* 102 Cal.App.2d 418, 227 P.2d 529 (1951), the California Court of Appeal stated that the rights of a surety to funds in the hands of the owner are not limited to retained funds, but to any funds due to the contractor under the terms of the contract:

" 'Where a surety of a construction contractor, upon the contractor's default, completes the contract, and the contractee has funds in his hands earned by the contractor, the surety is entitled to be subrogated to the rights which the contractee, upon the contractor's default, could assert against such funds, to the extent necessary to reimburse the surety for the outlay made to complete the contract. This right to the funds embraces not only retained percentages, but other funds earned by the contractor remaining in the hands of the contractee'. (*Standard Acc. Ins. Co. v. Federal Nat. Bank,* 112 F.2d 694[692])." 102 Cal.App.2d at 428, 227 P.2d 529.

Also recognizing the doctrine of equitable subrogation in California is the case of *Commercial Standard Insurance Co. v. Bank of America,* 57 Cal.App.3d 241, 129 Cal.Rptr. 91 (1976). California courts have also found that a surety with a right to subrogation would have been entitled to enforce the mechanic's liens rights of the claimants which it paid. See, for example, *Golden Eagle Insurance Co. v. First Nationwide Financial Corp.,* 26 Cal.App.4th 160, 31 Cal.Rptr.2d 815 (1994), where the court recognized the surety's equitable subrogation rights and found that where lien releases were not given by the claimants when paid, the surety could enforce the mechanic's liens rights against the owner of the project.

*Pearlman* has been recently directly applied by bankruptcy courts. See, for example, *In re Cone Constructors,* 265 B.R. 302 (Bankr.M.D.Fla.2001) where the court gave a surety equitable rights to retained funds where the surety paid subcontractor claims before the contractor filed bankruptcy. Also, in *In re QC Piping Installations,* 225 B.R. 553 (Bankr.E.D.N.Y.1998), the court found that the surety's equitable subrogation right to retained funds applied despite the expanded nature of property of the estate under § 541 (enacted after Pearlman.)

The principles asserted in *Pearlman* has also been extended beyond the Miller Act. In *In re Modular Structures, Inc.,* 27 F.3d 72 (3rd Cir.1994), the Third Circuit found the *Pearlman* doctrine extended to private contracts as well as government contracts. Courts have also extended the *Pearlman* doctrine to more than just "retained" funds. In *In re Alliance Properties, Inc.,* 104 B.R. 306 (Bankr.S.D.Ca.1989), the debtor's surety paid balances due to suppliers and subcontractors on the bonded projects. Under the contract, the govern-

ment was obligated to make progress payments to Alliance (the debtor) but was entitled to retain up to 10% of each progress payment to secure the debtor's complete performance. During the course of the project, Alliance asserted it did extra work on the project, entitling it to additional funds, and at the end of the job the debtor requested an "equitable adjustment" based on the extra work performed.

When the matter arrived in Bankruptcy Court, the funds available consisted of a final settlement of the debtor's remaining contract claims against the government for work performed on the project. The surety asserted that it was subrogated to the right which the government held to pay from the remaining funds unpaid claims of the subcontractors, since the surety had paid those claims. Ruling in favor of the surety, Judge Malugen stated:

"I conclude that INA [the surety] is entitled to assert an equitable lien against this fund. INA had demonstrated that: The contractor has defaulted in making payments to the subcontractors; INA had paid these claims; and the debtor-in-possession is now holding segregated funds which were due the debtor for work performed on the bonded contract. [citations omitted]

TPB [the secured bank] concedes that the debtor has not paid the subcontractors on the Randolph contract and, as a result of this default, INA has satisfied these claims. While the record is not clear as to which portion of this fund is attributable to retentions, progress payments or contract damages, resolution of this uncertainty is not crucial. See, *In re E.R. Fegert, Inc.,* 88 B.R. [258] at 266 [(9th Cir. BAP 1988)]. The inescapable fact is that the fund is a part of the final payment on the Randolph contract.

The basis for INA's lien is that the surety is equitably subrogated to the government's right to withhold payments from the contractor and to apply them to the unpaid claims of the subcontractors .... The government had an obligation to withhold from the final payment to API money sufficient to satisfy the unpaid claims of the subcontractors who worked on the Randolph contract. INA discharged this obligation and was subrogated to this right. This right was a cumulative right or remedy afforded INA under the contract and in addition to any other rights it could have claimed through the subcontractors themselves." 104 B.R. at 311.

The District Court in Alaska also found that the contract funds payable to the surety need not be retained funds. In *Reliance Insurance Companies, Inc. v. Alaska State Housing Authority,* 323 F.Supp. 1370 (D.Alaska 1971) the court cited *Pearlman* and found that its holding was not limited to just retained percentages:

"A surety who completes a contract or satisfies the claims of laborers and materialmen has established a subrogation right to all funds, progress payments, or retained percentages, which are in the hands of the contractee. Reliance's right of subrogation relates to the execution of the surety agreement. Reliance stands in the position of the principal, N & N, and to give full effect to the purpose of the surety agreement it is correct that those funds in the nature of progress payments be made available to satisfy the claims of the laborers and materialmen." 323 F.Supp. at 1373.

Cases in the Sixth Circuit, capped by the circuit court itself in *In re Construction Alternatives, Inc.,* 2 F.3d 670 (6th Cir. 1993), favored the trustee or secured creditor over the surety when the underlying contract did not have a retention clause. In *Construction Alternatives,* after the

debtor had completed all of its work on an asbestos removal project and was due to receive its final progress payment, the surety paid at least two unpaid subcontractors and suppliers on the project. The contractee, school district, had no right under its contract with the debtor to retain any portion of the progress payments pending the debtor's payment of subcontractors or suppliers. Although the surety stood in the shoes of the school district after paying the subcontractors, since the school district had no right to the retained funds, neither did the surety. In *Construction Alternatives*, the unpaid subcontractors had not filed mechanic's liens against the project and had not given notice to the school district which would have required it to retain funds.

The holding in *Construction Alternatives* was followed in *In re Wm. Cargile Contractor, Inc.*, 203 B.R. 644 (Bankr. S.D.Ohio 1996) where, again, the contract had no retention clause. As in *Construction Alternatives*, the obligee on the Cargile contract (the City of Cincinnati) had no duty to pay subcontractors. Consequently, although the surety had a duty to pay the subcontractors under a performance bond, placing the surety in the position of the City, the City had no such duty and the surety received nothing under equitable subrogation theories. Since the City had no right to withhold payments from the debtor, the surety had no superior rights over the estate[7].

The facts of the instant case parallel *Pearlman* and its prodigy, not the Sixth Circuit exceptions. First, all three of the pertinent contracts between Colt and the owner/general contractor had progress payment and retention clauses. The perti-

nent portions of the Biltmore contract provide as follows:

"2.2 Progress Payments: Subject to all of the terms and conditions of the contract documents and this subcontract, including without limitation paragraphs 2.1 and 2.4, Biltmore shall pay subcontractor monthly for the portion of the subcontractor's work actually installed, less 10% retention, and less previous payments, back charges, and such amounts as Biltmore may determine, in good faith, are necessary to protect the project against liens, or correct faulty or incomplete work.

2.3 Retention: Subject to the provisions of paragraphs 2.1 and 2.4, subcontractor's retention shall be paid after both: (1) Biltmore's actual receipt of its retention under the prime contract; and (2) thirty-five days have passed since the recording of a valid Notice of Completion. . . .

2.4 Conditions to be Met by Subcontractor Prior to Payment: Biltmore's obligation to pay all or any portion of the subcontract amount is conditioned on subcontractor's strict compliance with all of the provisions the subcontract, including without limitation, the payment procedures established under the contract documents and/or such additional procedures as may be established by the owner and/or construction lender. At a minimum, the subcontractors shall submit the following with each billing:

(1) Lien releases upon progress payment (either conditional and/or unconditional) from subcontractor and all subcontractor's suppliers, lower tier subcontractors, and all laborers through the date of the invoice. . . . (2) unconditional lien releases upon prog-

---

**7.** Although *Cargile Contractor* is not specific, it appears from the facts that the unpaid subcontractors did not file mechanic's liens or stop notices, which would have created an obligation for the City to pay them before the job was completed.

ress payment from subcontractor and all of subcontractor's suppliers and lower tier subcontractors through the date of the next previous invoice for which payment has been received by subcontractor; ...

2.5 Biltmore's Right to Withhold: Biltmore shall have the right to withhold payment from subcontractor at any time it reasonably believes the subcontractor is in default on this, or any other agreement or contract it may have with Biltmore, and is reasonably concerned that subcontractor will not cure the default. Defaults may include, without limitation, defective workmanship, reasonably reliable information that there are past due bills of subcontractor relating to the project, ..."

This language of the Biltmore contract makes it clear that the contractor is entitled to make progress payments, withhold retention, and withhold any funds necessary to complete the project lien free. Until Colt had completed the project with no liens outstanding, Colt was not entitled to receive the balance of contract funds, whether such funds were withheld, retained, or otherwise in the hands of the contractee. Subrogation of Ulico to the rights of the contractee of the Biltmore contract gives it a right to the funds held to pay subcontractors with claims or liens.

The language in the two RB & G contracts (Long Beach project and Glendale project) give the contractee similar rights:

"20(a) Subcontractor agrees to turn said work over to contractor in good condition and free and clear from all claims, encumbrances, and liens for labor, services or material, and to protect and save contractor and owner from all claims, encumbrances and liens growing out of performance of this work and all maintenance required under the contract documents, and should subcontrac-

tor, during the progress of said work, or at any time thereafter, fail to pay for all labor, services and material used or purchased for use in the prosecution of said work, contractor may, at its option, and without notice to subcontractor, pay all such claims whether or not claimant has perfected a lien or bond claim and charge the amounts thereof to subcontractor. . . .

23(a) On the 25th day of each month subcontractor shall present to contractor a statement of the work done during that month, which statement, when checked and approved by contractor, will be paid on the 25th day of the following month after receipt of payment from owner, provided that contractor may, at its option on each payment, retain 10% or the percentage specified in the contract document, of each estimate until final payment, which shall be made after completion of the work covered by contract and written acceptance thereof by architect, and full payment therefore.

(b) Any payments due subcontractor hereunder may be withheld by contractor in the event subcontractor is in default of any of its obligations hereunder and such amounts may be retained by contractor until such event of default is corrected."

The above cited language in the RB & G contracts requires Colt to complete the work on the contract and deliver the job lien free before the contract is completed. The contractee is entitled to withhold funds in the event Colt is in default of any of its obligations under the contract and use such funds to pay all claims, whether or not the claimant has perfected a lien or bond claim. Until such payment is made, the contractee is entitled to backcharge (i.e. deduct) the amounts from the sums due to Colt.

Trial evidence reflected that several suppliers and laborers on each of the contracts were not paid timely by Colt. In every instance, these unpaid contractors made a claim against the contract funds, including in most cases recording mechanic's liens and following up with necessary litigation. Ulico verified the validity of the claims of each unpaid claimant. In exchange, Ulico obtained a lien release from each supplier and laborer, releases which were necessary for the debtor to complete performance under each contract. Without these lien releases, the contracts were not completed.

Joseph Maleki, attorney for RB & G Construction, testified regarding settlement negotiations and final payment of settlement funds on the Long Beach and Glendale projects. Payment made on each contract was the final payment due to Colt for all work done. Colt had filed state court litigation on the contracts, claiming it was not paid for work performed under the contract, including change orders, and asking for delay and disruption damages. RB & G cross-complained against Colt, claiming the work was defective and incomplete and Colt was in breach for not paying the lien claimants. On both contracts RB & G had withheld money to pay the lien claimants under paragraph 23(b) of the contracts. The settlement agreements were intended to pay all final monies due to Colt for performance under the contracts; they were conditioned on the jobs being delivered lien free. Monies were paid for all claims, including delay damages, disruption cost, change orders, and claimed attorney's fees.

Dennis McGahey, President of Biltmore, testified that Biltmore stopped paying Colt under the contract when it became aware of the mechanic's liens of Burns and other materialmen and labor suppliers. Eventually Colt pulled off the job without completing the work and litigation ensued. The final settlement payment, negotiated by Andrade for Colt and with other parties, paid all funds remaining due to Colt under the contract for change orders, delay and disruption damages, and attorney's fees under the terms of the contract.

The Biltmore settlement agreement on the San Diego project specifically provides that Colt warrants and represents that all suppliers and laborers have been paid in full and all lien rights extinguished. (See paragraph 3.6 of Exhibit 14 in evidence). The settlement agreements on the Glendale project and the Long Beach project (Exhibits 12 & 13 in evidence) do not specifically provide for the lien releases of Colt's subcontractors. However, the testimony of Joseph Maleki clearly implied that the settlements would not have been achieved unless the jobs could be delivered completed and lien free.

To the extent that the theory of equitable subrogation is a claim in equity, Ulico is entitled to such equitable treatment. Without the lien releases which Ulico supplied as a result of paying the claimants on each of the three projects, the settlements could not have been achieved. The source of the settlement funds is not relevant. What is relevant is that the funds constituted final payments due under the contracts. The contracts were not completed by the debtor until Ulico obtained the lien releases upon paying the lien claimants. But for Ulico's payment, no settlement funds would have been forthcoming and neither the estate nor the secured creditors would be making a claim to any funds.

This court's findings follow the principles of *Pearlman*, as extended by numerous cases cited above. Sixth Circuit cases, which gave no equitable rights to the sureties, are distinguishable because in those cases the owners had no obligation to pay the subcontractors and materialmen since

no liens had been recorded and neither the contracts nor the law required such payment. Here, mechanic's liens had been recorded and the contracts required Colt to deliver the projects lien free before the contracts were completed. Without completion, Colt was not entitled to any further contract funds. Payment to Ulico is equitable.

## IV.

### ANDRADE & ASSOCIATES' RIGHT TO $100,000.00 FROM SAN DIEGO PROJECT SETTLEMENT IS VALID UNDER CALIFORNIA LAW

Andrade & Associates has asserted an attorney fees lien in some or all of the settlement funds held or on behalf of the estate in this case. Andrade's theories are various, ranging from asserting a charging lien or retaining lien to claiming some equitable interest because their efforts in litigating the Colt matters resulted in the settlement funds. To determine the extent of Andrade's rights, the court must look at underlying California law on attorney's liens, apply that law in the bankruptcy setting, and analyze the specific facts of this case. This court finds that Andrade has both a charging lien and a retaining lien on $100,000.00 of the San Diego project settlement funds, based on the settlement documents, the proven intent of the parties, and the brief retention of those funds in the attorney-client trust account of Andrade.

■■■ California law explicitly recognizes a retaining lien held by an attorney who has possession of settlement funds where the attorney had a prior lien agreement with the client, litigated on behalf of the client, achieved a settlement for the client, and received payment of the settlement funds into the attorney's trust account. See, for example, *In Winnett*, 97

B.R. 7, 10 (Bankr.E.D.Ca.1989). Such a retaining lien is possessory. Therefore, it is essential that the lienholder have possession of the property. Possession of the funds in the attorney's client trust account is sufficient to assert the possessory lien, when the client files bankruptcy. *In re Winnett*, 97 B.R. at 9.

■■ California also recognizes a charging lien, which arises out of a contractual agreement between the attorney and his client, where the parties intend the attorney to look to a recovered judgment for attorney's fees. In *Isrin v. Superior Court*, 63 Cal.2d 153, 157, 45 Cal.Rptr. 320, 403 P.2d 728 (1965), the court set the standard for charging liens in contingency fee cases:

"As contingent fee contracts are subject to the normal rules of construction of fiduciary agreements (*Tracy v. Ringole* (1927) 87 Cal.App. 549, 551, 262 P. 73), a charging lien will be imposed if the parties have manifested an intention that the attorney shall look to the judgment as security for his fee even though the word 'lien' has not been used... and in some cases the evidence held to demonstrate such an intent has been slight indeed...."

The court clarified its position further:

"For our present purposes, however, we need not attempt resolution of such conflicts in the law of attorney's liens. It will be enough to observe that in whatever terms one characterizes an attorney's lien under a contingent fee contract, it is no more than a *security* interest in the *proceeds* of the litigation." *Isrin*, 63 Cal.2d at 158, 45 Cal. Rptr. 320, 403 P.2d 728. (emphasis in original)

The recognition of a charging lien has been embraced in 9th Circuit cases:

"California does not recognize the common law attorneys' charging lien, and

this court has noted that fact. *Desser, Rau & Hoffman v. Goggin*, 240 F.2d 84 (9th Cir.1957). Instead, California attorneys may look to the funds generated by their efforts to collect the fees only as directed by the California Supreme Court. In *Isrin v. Superior Court*, 63 Cal.2d 153, 45 Cal.Rptr. 320, 403 P.2d 728 ..., decided after *Desser, Rau & Hoffman*, the California Supreme Court held that the intent of the parties determines the type of claim an attorney may assert against any fund generated due to his efforts. 63 Cal.2d at 158–59, 45 Cal. Rptr. 320, 403 P.2d 728.... In essence, *Isrin* holds that if the parties intend that the attorney look directly to the settlement for payment, then a lien against that settlement is created in the attorney's favor...." *In re Pacific Far East Line*, Inc., 654 F.2d 664, 668–69 (9th Cir.1981).

■ In essence, in California a charging lien is only recognized if it is based on the intent of the parties to create such lien. See, for example, *Gelfand, Greer, Popko & Miller v. Shivener*, 30 Cal.App.3d 364, 105 Cal.Rptr. 445 (1973), where the court found that the word "lien" need not be used but the intent of the parties must be expressed:

"Thus, we are confronted squarely with the question whether an attorney's contingent fee contract containing no words as to a lien, security or assignment does as a matter of law and without more create a lien to secure his fees on the judgment or property obtained as a result of his services.

We are not prepared to go so far. As we discuss later, a lien may be created without the use of the word 'lien.' It does not follow that in every case a lien is created as matter of law.

Our research persuades us that in the absence of express language declaring a lien, the giving of security or of assignment, the question whether the contract creates a lien is one of fact involving a determination of the intention of the parties." *Shivener*, 30 Cal.App.3d at 370, 105 Cal.Rptr. 445.

Even if a valid attorney's lien can be asserted, the question of the priority of such lien versus a perfected secured creditor with a UCC–1 recorded on a debtor's accounts is dependent on several factors. A recent California case, *Atascadero Factory Outlets Inc. v. Augustini & Wheeler, LLP*, 83 Cal.App.4th 717, 99 Cal.Rptr.2d 911 (2000), found that an attorney's lien does not trump a prior recorded UCC–1 lien on the theory of unjust enrichment. In *Atascadero Factory Outlets*, Camino Real Fashion Outlets borrowed $400,000.00 from Santa Lucia National Bank to complete a mall project. Thereafter, Camino sold the mall to Atascadero Factory Outlets, Inc. ("A.F.O.") and agreed to pay the broker, Wallace Moir Company, a $250,000.00 commission. The sale generated no cash. Instead, Camino received a "Contingent Payment Obligation Note Secured By Deed of Trust" estimated to be worth $3.5 million dollars. The note provided that the sales price would be determined after the mall opened based on a formula.

Camino assigned the note to Santa Lucia Bank for security on the loan. Camino executed a pledge agreement providing that the Bank would receive the first $400,000.00 and the Broker would receive the next $100,000.00 on the note. In January, 1996, the buyer AFO claimed the payoff amount was zero. Camino retained the law firm of Augustini & Wheeler ("A & W") and sued on the note. After the action was ordered to arbitration, Camino signed a retainer agreement which gave A & W a lien on the case. A & W knew about the pledge agreement but did not

ask the bank and broker to subordinate their security interest.

The arbitrator awarded $360,000.00 on the note plus $140,000.00 of attorney's fees. AFO interpled the total $500,000.00 based on the conflicting claims of the bank, broker and A & W. A & W asserted that its attorney's lien should be paid before the security interest of the bank, even though later in time, because the bank would be unjustly enriched by the efforts of A & W to secure the arbitration settlement. The court found otherwise, ruling:

> "... A & W has not demonstrated, as a matter of law or equity, that it has lien priority. Civil Code section 3525 provides: 'Between rights otherwise equal, the earliest is preferred.' ... Bank and Broker perfected their security interests two years before Camino gave A & W a lien on the note proceeds." 83 Cal. App.4th at 721, 99 Cal.Rptr.2d 911.

As a result, A & W was not entitled to monies under its attorney's lien because it was not first in time. (This case would appear to run counter to *Producers Cotton Oil Company v. Amstar Corporation,* 197 Cal.App.3d 638, 242 Cal.Rptr. 914 (1988), which Andrade cited for the principle that equity can trump UCC security where the party knows and acquiesces in efforts by others to obtain proceeds subject to the security rights. The *Producers Cotton Oil* court allowed the claim for crop harvesting costs to trump the security rights based on equitable unjust enrichment.)

Under California law, an attorney's lien can trump UCC secured rights if it is based on a tort recovery under the exception provided in Commercial Code 9104(k). Otherwise, it would appear that an attorney's lien created subsequent to a UCC–1 recording would not trump the UCC security rights.

▇ In this case, Andrade asserts it has a charging lien based on two written retainer agreements with Colt, the Andrade & Muzi retainer agreement dated December 9, 1997 (Exhibit 273 in evidence) and the Andrade & Associates retainer agreement dated June 15, 1999 (Exhibits 239 and 241 in evidence). The court finds that neither of these retainer agreements are contracts by which Andrade may claim recovery on the settlement funds from the Biltmore project (San Diego), the two RB & G projects (Glendale and Long Beach), the RHI settlement, or the City of Glendale settlement. The language of both retainer agreements is the same. Both agreements have a "re:" line—in the Andrade & Muzi agreement it is " *Colt Engineering Company, Inc. v. Commerce Construction Company, et al.*" and "*Colt Engineering Company, Inc. v. Actus/Sundt.*" In the Andrade & Associates retainer agreement it is "*Colt Engineering Company, Inc. v. Allied Equipment Rentals, Inc.*" Both retainer agreements contain similar language regarding liens:

### LIEN OF ATTORNEYS

"The attorneys shall have a lien for services rendered on any sums received or recovered, whether by settlement or judgment, on account of the aforesaid claims of the client. The client understands that this means attorneys may deduct any and all fees or other amounts due attorneys, including amounts advanced on behalf of client, from any and all amounts recovered on behalf of client, either in their capacity as attorneys or as trustee for client."

The court finds that the language "on account of the aforesaid claims of the client" refers to the litigation in the "re:" line of each letter; i.e., litigation with Commerce Construction Company and Actus/Sundt for Andrade & Muzi and litigation with Allied Equipment Rentals for Andrade & Associates. Neither of these retainer agreements gives Andrade & Associates an attorney's lien on amounts re-

covered in settlement of the Biltmore, RB & G, or other litigation. Because of this finding, it is unnecessary for the court to determine whether Andrade & Muzi and Andrade & Associates are one and the same law firm, whether the dissolution of Andrade & Muzi assigned the rights under the Andrade & Muzi retainer agreement to Andrade & Associates, or whether the subsequent incorporation of Andrade & Associates makes any difference. Also, the court need not determine whether the Andrade & Muzi agreement, signed on behalf of Colt by Frank Roberts, R.M.E., is binding on Colt since Frank Roberts was not president of Colt [8].

■ As a consequence of this finding, Andrade does not have an attorney's charging lien based on the retainer agreements. However, California law makes it clear that the court may find a charging lien where it is memorialized by an agreement by the parties. The court finds such an agreement by reading together the handwritten settlement document on the San Diego project (Exhibit 276 in evidence) and the formal settlement agreement (Exhibit 14 in evidence). Both of these agreements specifically provide that $100,000.00 of the settlement funds shall be payable directly to Andrade. Both of these agreements have been signed by Franklin David Roberts on behalf of Colt. As a consequence, both of these agreements expressly show an intent by Colt that Andrade have a lien on the proceeds recovered on the San Diego project. This intent establishes a charging lien in favor of Andrade.

■ After the execution of these agreements, upon order of the Los Ange-les Superior Court, the settlement funds were all deposited into the attorney client trust account of Andrade & Associates. Even though those funds were not written in separate checks to Andrade and Colt, since the intent of Colt was that Andrade receive the funds as its attorney's fees, the failure to issue separate checks is not material. The funds were removed from the Andrade trust account only upon further order of the Los Angeles Superior Court that the funds be held by that court. While Andrade held the funds, it had a valid possessory (retaining) lien in the funds which would trump the UCC security interest of Merrill Lynch. The transfer of those funds to a blocked account in Los Angeles Superior Court does not change the nature of Andrade's initial retaining lien. As a result, Andrade has a valid enforceable charging lien and retaining lien in the $100,000.00 settlement from the San Diego project. As noted above, however, Andrade has no other enforceable lien rights to any of the other settlement recoveries and its recovery is limited to the $100,000.00 [9].

## V.

*MERRILL LYNCH FAILED TO ESTABLISH THE AMOUNT OF ITS SECURED CLAIM AT TRIAL; HOWEVER, THE STIPULATION BY THE CHAPTER 7 TRUSTEE THAT THE CLAIM IS VALID AWARDS THE BALANCE OF THE SETTLEMENT FUNDS TO MERRILL LYNCH, SUBJECT TO TRUSTEE'S 506(c) CLAIM*

The joint pre-trial order in this case established the validity of Merrill Lynch's

---

8. Andrade later perceived that David Roberts needed to sign the retainer agreement, resulting in the second agreement.

9. The court notes that Andrade was not attorney of record for Colt when any of the other settlement funds were realized for the estate and any lien rights might also be challenged on that ground. The court need not decide that issue since the retainer letters limited their scope to the "re:" line.

secured claim against the accounts of Colt.[10] However, left as an issue of disputed fact for trial was the amount due to Merrill Lynch under its security documents.[11] Merrill Lynch failed to establish an amount due to it under its secured loans through evidence at trial. Attempting to fill in the gap, Merrill Lynch solicited and received a stipulation from the Chapter 7 trustee that the claim filed in the main case by Merrill Lynch was valid, that claim being in the secured amount of $659,328.43 plus total accrued interest of $4,830.97, on the petition date, plus accruing interest and costs. Merrill Lynch then requested the court to take judicial notice of the claim filed in the case. The court took judicial notice of the fact that Merrill Lynch had filed a claim in that amount in the main case.

At the court's request, the parties briefed the effect on the adversary trials of the trustee's stipulation to Merrill Lynch's claim. This court finds that the weight of authority supports the position of Ulico and Andrade that the trustee's stipulation does not bind them. Courts have held that although the trustee represents the interests of general unsecured creditors with regard to objecting to claims, the interest of secured creditors may diverge from those of the trustee and entitle such creditors to independently object. See, for example, *Power Five, Inc. v. General Motors Corporation*, 219 B.R. 513 (S.D.Ind.1998); *In re Dominelli*, 820 F.2d 313 (9th Cir.1987); *In re Grassgreen*, 172 B.R. 383 (Bankr.M.D.Fla.1994); *In re Video Cassette Games, Inc.*, 108 B.R. 347 (Bankr.N.D.Ga.1989). The cases also show that the trustee's stipulation (non-objection) to the validity of a proof of claim in the main case is not binding on other parties in an adversary. See, for example, *In re Schraiber*, 1992 WL 280801 (Bankr. N.D.Ill.1992), where the court stated that evidence in a related bankruptcy proceeding was not evidence in an adversary proceeding. Although this court took judicial notice that Merrill Lynch filed a proof of claim in the main case, the claim was not included in the pre-trial order in the adversaries and is not direct evidence. *In re Grabill Corp.*, 121 B.R. 983 (Bankr.N.D.Ill. 1990); *J.T. Carr v. City of Florence, Alabama*, 729 F.Supp. 783 (N.D.Ala.1990).

Even if Merrill Lynch's proof of claim in the main case was received as evidence in this case, it would not meet Merrill Lynch's burden of establishing the amount of its secured claim. The court has reviewed the claim, No. 32 in the main case. The face sheet of the claim states that as of the date of the filing, Merrill Lynch was owed the principal sum of $659,328.43. Attached to the proof of claim is the WCMA note, loan and security agreement, the WCMA reducing revolver loan and security agreement, and the UCC–1 financing statement. The proof of claim does not attach an accounting, credit and debit ledger, loan history, or any other financial document which establishes the loan history on the accounts nor the amount due on the petition date. Filing of this proof of claim was not even *prima facie* evidence of the secured amount due to Merrill Lynch.

Section 502(a) of the Bankruptcy Code provides that a proof of claim is deemed

---

10. See Stipulated Facts Nos. 41 through 48, which establish the validity of the WCMA note, loan and security agreement and the WCMA reducing revolving loan and security agreement, as perfected by the UCC–1 financing statement recorded by Merrill Lynch against the interests of the debtor.

11. Disputed Fact No. 61 questions Merrill Lynch's claim that not less than $660,000.00 interest and costs was due.

allowed unless a party-in-interest objects. This concept was expanded by *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991) where the court stated "If those allegations in [the proof of claim] set forth all of the necessary facts to establish a claim and are not self-contradictory, they *prima facie* establish the claim(emphasis supplied)." The claimant must first allege facts sufficient to support its claim; if the averments in the filed proof of claim are sufficient to do so, then the proof of claim is entitled to *prima facie* validity. *In re Consolidated Pioneer Mortgage,* 178 B.R. 222, 226 (9th Cir. BAP 1995), *citing In re Allegheny International,* 954 F.2d 167, 173–74 (3rd Cir.1992).

It would follow, however, that if the claimant fails to provide sufficient facts to establish the amount and validity of its claim, then the proof of claim would not enjoy the *prima facie* validity set forth in Section 502(a). In *Pioneer Mortgage,* the 9th Circuit BAP noted that, if a proof of claim is based on a writing and the claimant has failed to attached those writings to its proof of claim, the claim is not entitled to be considered as *prima facie* evidence of the claim's validity. *Pioneer Mortgage,* 178 B.R. at 226. Similarly, if an amount due stated in a proof of claim would be based on a loan history, accounting, or some other business records, the failure to attach such documents also defeats its *prima facie* validity. Therefore, even if the Merrill Lynch claim is considered as part of the evidence in these adversaries, the court would not find that Merrill Lynch is owed its stated secured sum when challenged by Ulico and Andrade. However, in the context of the prior rulings made by the court, this finding is basically irrelevant. The court has already found the awards to Ulico and Andrade to be $515,189.49 and $100,000.00 respectively. Based on the trustee's stipu-

lation that Merrill Lynch's proof of claim is valid, the balance of the settlement funds not paid to Ulico or Andrade fall to the estate, and hence, subject to Merrill Lynch's secured claim. The court calculates this balance at $224,310.51.

Prior to trial of this adversary proceeding, the trustee filed a motion under Section 506(c) for attorney's fees and other costs to be carved out of Merrill Lynch's secured claim. The court deferred ruling on that motion because of the uncertainties created by the undetermined adversaries at that time. Within two weeks of the release of this decision, the court will make a ruling on the 506(c) claims of the trustee and its attorneys.

## VI.

### CONCLUSION

Based on the foregoing decision, the court awards to Ulico under its claim for equitable subrogation the sum of $513,189.49, finding that this sum is not property of the bankruptcy estate. The court awards Andrade & Associates the sum of $100,000.00 under its attorney's charging lien and retaining lien. The balance of the sum, $224,310.51, is awarded to Merrill Lynch based on its stipulated (with the trustee) secured claim, subject to the 506(c) motion of the trustee.